**JOHN C. GRIMBERG COMPANY, INC., Plaintiff–Appellant,**

v.

**UNITED STATES, Defendant–Appellee.**

**No. 98–5142.**

United States Court of Appeals, Federal Circuit.

July 27, 1999.

Herman M. Braude, Braude & Margulies, P.C., Washington, DC, argued for plaintiff-appellant.

Michael D. Austin, Attorney, Commercial Litigation Branch, Civil Division, Department of Justice, Washington, DC, argued for defendant-appellee. With him on the brief were David M. Cohen, Director and Sharon Y. Eubanks, Assistant Director.

Before NEWMAN, PLAGER, and CLEVENGER, Circuit Judges.

CLEVENGER, Circuit Judge.

Appellant John C. Grimberg Company, Inc. ("Grimberg") appeals from the decision by the United States Court of Federal Claims granting the government's motion for summary judgment in Grimberg's pre-award bid protest dispute. *See John C. Grimberg Co. v. United States*, No. 98–338C (Fed.Cl. July 20, 1998). Because we conclude that the United States Department of Agriculture's determination that Grimberg was not a responsible bidder was not arbitrary, capricious, an abuse of discretion, or otherwise not in accord with law, we affirm.

I

In November 1997, the United States Department of Agriculture ("USDA" or "agency") published in *The Commerce Business Daily* its intent to renovate the USDA South Building in Washington, D.C. On December 1, the USDA issued a solicitation for sealed bids to renovate office space and building plant areas in one wing of the building (the "South Wing project"). Section L.7 of the solicitation, titled "Competency of the Bidder," announced four special standards that the USDA would use in determining whether a potential awardee was a responsible bidder. That section stated that to be eligible for the contract, a bidder had to meet four minimum requirements: (1) the bidder must have completed three projects within the past six years involving the restoration or renovation of building interiors and exteriors of historic properties that were "*of the size and complexity of the proposed project*"; (2) the bidder must demonstrate that it exercised project management skills on its previous projects; (3) the bidder must assign at least one individual to the South Wing project who had five years of project management experience on renovation projects; and (4) the bidder must have a plan that meets the project schedule. Solicitation No. IFB–00–98–B–808 ¶ L.7, Joint Appendix at 28 (emphasis added). The solicitation did not explicitly define the phrase "of the size and complexity of the proposed project," although the solicitation

did state that the estimated price of the project was greater than $10 million and that the total construction area of the project was approximately 130,000 sq-ft. *See id.* ¶ 10, Joint Appendix at 24; Commerce Business Daily (Nov. 13, 1997).

Grimberg submitted a bid with an aggregate bid price of $14,326,170. On January 21, 1998, the USDA notified Grimberg by letter that it was the apparent low bidder on the project. The letter requested that Grimberg promptly submit information documenting its competency to undertake the project, as set forth in the bid solicitation. In response, Grimberg submitted its responsibility package on January 27, which included a list of fourteen projects undertaken over the prior six years that Grimberg considered comparable in size and complexity to the South Wing project. Grimberg provided detailed descriptions for four of these projects.

In order to determine whether Grimberg's detailed submissions on its four prior projects demonstrated its responsibility for the project under solicitation, a USDA evaluation committee developed a Building Comparison Chart (the "Comparison Chart") to compare the size and complexity of Grimberg's prior projects with the South Wing project, based on the following eleven criteria: (1) size of the project, (2) number of stories, (3) construction cost, (4) age of the building, (5) building occupancy or surrounding-area occupancy by tenants, (6) existing infrastructure/coordinate with the rest/other buildings, (7) historic preservation, (8) mechanical, electrical, and plumbing work, (9) multiple elevator restoration, (10) construction duration, and (11) multiple restroom renovation. *See* Joint Appendix at 8–9. The Comparison Chart was not disclosed to Grimberg before or during the USDA's responsibility evaluation. Grimberg also asserts, without dispute from the government, that the chart was not prepared until after it had submitted its responsibility package.

After analyzing Grimberg's four detailed project descriptions with the aid of the

Building Comparison Chart, the evaluation committee determined that only one of the four projects was of the size and complexity of the proposed South Wing project and therefore that Grimberg had failed to satisfy the first special standard enunciated in section L.7 of the solicitation. In addition, the evaluation committee found that although Grimberg met the second special standard, it failed to meet both the third and fourth special standards. The contracting officer therefore determined that Grimberg was not a responsible bidder.

Grimberg filed a pre-award bid protest suit in the United States Court of Federal Claims. Upon cross motions for summary judgment, the trial court ruled in favor of the government, holding that Grimberg failed the "size and complexity" and the "project management experience" special standards. Grimberg appeals to this court, claiming first that the trial court erred by failing to find that the Comparison Chart criteria were "special standards" of responsibility under the Federal Acquisition Regulations ("FARs"), and accordingly should have been identified as such in the solicitation. *See* 48 C.F.R. § 9.104–2 (1998). Second, Grimberg asserts that the court erred by finding that the USDA did not act illegally when it chose not to seek additional information from Grimberg before determining that Grimberg was nonresponsible on the "size and complexity" special standard, and when it decided not to afford Grimberg the opportunity to cure its defective schedule or respond to the concerns about its proposed project manager, which had caused it to fail the "project management experience" special standard. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(3).

## II

■ We review decisions by the Court of Federal Claims for errors of law and clearly erroneous findings of fact. *See, e.g., Yancey v. United States,* 915 F.2d 1534, 1537 (Fed.Cir.1990). The USDA's determination that Grimberg was not responsible must be upheld unless it is "arbitrary, capricious, an abuse of discretion, or

otherwise not in accordance with law." 5 U.S.C. § 706 (1994); *see* 28 U.S.C. § 1491(b)(4) (1994); *Keco Indus., Inc. v. United States,* 203 Ct.Cl. 566, 492 F.2d 1200, 1203 (1974).

### A

Grimberg first argues that the eleven factors contained in the Comparison Chart were special standards required to be provided to Grimberg and other bidders in the solicitation. *See* 48 C.F.R. § 9.104–2(a) (1998) (stating that any special standards for responsibility "shall be set forth in the solicitation (and so identified) and shall apply to all offerors"). Had it known of these special criteria, Grimberg argues, it could have more adequately addressed the evaluation committee's concerns in its responsibility package, or it might have chosen not to submit a bid at all. Grimberg asserts that, by withholding the responsibility criteria from Grimberg until after if had submitted its responsibility data, the USDA effectively engaged in an illegal process in which it first solicited a round of bids based on price, and then decided whether it wanted to accept the low bidder (Grimberg) for the contract. The government responds that the eleven criteria are not special standards but merely factors implicit in the "size and complexity" special standard announced in paragraph L.7 of the solicitation.

■ Grimberg correctly asserts that the agency may not rely on criteria used to evaluate responsibility as a means for circumventing the sealed bid procedure. In government procurement practice, sealed bidding must be used unless one of four statutory exceptions is met. *See* 10 U.S.C. § 2304(a)(2) (1994); 41 U.S.C. § 253(a)(2) (1994). The purpose of sealed bidding is to obtain the most advantageous contract for the government; this goal is achieved by requiring the government to define its needs with precision, conducting an open competition to maximize competition, opening bids publicly, and preventing favoritism by reducing the discretion of gov-

ernment employees to a minimum. *See, e.g., United States v. Brookridge Farm, Inc.,* 111 F.2d 461, 463 (10th Cir.1940); John Cibinic, Jr. & Ralph C. Nash, Jr., *Formation of Government Contracts* 505–07 (3d ed.1998).

At the same time, agencies are charged with the task of awarding contracts only to "responsible bidder[s]" who are capable of performing the contract. 10 U.S.C. § 2305(b)(3) (1994); 41 U.S.C. § 253(b)(4) (1994); *see also* 48 C.F.R. § 9.103 (1998). Responsibility standards are divided into two categories: general standards and special standards. *See* 48 C.F.R. §§ 9.104–1, –2 (1998). General standards are prescribed by regulation and apply to all contractors regardless of whether the solicitation specifically mentions responsibility. General standards ask whether a contractor has the general ability to perform the contract adequately, and requires consideration of factors such as the contractor's financial resources, ability to meet delivery schedules, past performance record, and record of integrity. *See id.* § 9.104–1. Special standards, also known as "definitive performance criteria," are used when the general standards are inadequate for a particular job, such as "when experience has demonstrated that unusual expertise or specialized facilities are needed for adequate contract performance." *Id.* § 9.104–2(a). Special standards allow the government to prescribe in more detail the minimum standards or experience that a contractor must possess in order to be deemed responsible, and therefore puts unqualified contractors on notice not to waste resources bidding for contracts that they will not be awarded. To ensure fairness to all contractors, however, special standards must be identified as such in the bid solicitation, must apply to all bidders, and cannot be waived by the contracting officer. *See id.; In re Mary Kathleen Collins Trust,* Comp. Gen. Dec. B–261019.2, 96–1 CPD ¶ 164 (1995); *George Hyman Constr. Co.,* Comp. Gen. Dec. B–265798, 95–2 CPD ¶ 173 (1995).

Grimberg's allegation that the USDA improperly applied undisclosed special standards to its responsibility submissions is based on its reading of the Comparison Chart. The eleven criteria are listed as separate rows on the left side of the chart, and five projects—the reference South Wing project and Grimberg's four responsibility submissions—are listed across the top, each comprising a column of the chart. *See* Joint Appendix at 105–06. In each box of the chart, a number or a description matching the project (column) and attribute (row) is listed. For example, the size of the South Wing project is listed as 130,000 sq-ft, whereas Grimberg's projects are listed at 144,488 sq-ft, 65,550 sq-ft, 70,000 sq-ft, and 100,000 sq-ft, respectively. *See id.* at 105. The chart shows the construction cost of the South Wing project to be $15 million, whereas Grimberg's projects are listed at $12 million, $9,068,888, $7.2 million, and $9 million, respectively. *See id.* In addition, the chart includes two extra rows titled "Minimum size (For Evaluation Purposes)" and "Minimum Construction Cost for Evaluation Purposes." The chart shows that the evaluation committee was looking for projects of at least 100,000 sq-ft and $12 million and, accordingly, two of Grimberg's projects received the description "No" under the former heading whereas three projects received the score "No" under the latter heading. Certain boxes in the Comparison Chart also are marked with an asterisk, apparently indicating that the Grimberg project "did not meet requirements" of that particular attribute. *Id.*

Grimberg views the Comparison Chart criteria as *de facto* special standards because its projects were compared against the criteria, its projects did not meet the contracting officer's expectations with respect to certain criteria, and therefore three of the four projects were deemed not to be of the same "size and complexity" as the South Wing project. These facts alone, however, are insufficient to establish that the criteria are special standards. A

project's failure to equal the South Wing project on any one of the eleven criteria did not automatically disqualify that project from being considered of comparable size and complexity as the South Wing project. The trial court specifically found without clear error that, as a factual matter, no quantitative requirement had to be met under any of the eleven criteria, and instead that the eleven criteria were used only as tools to guide the evaluation of each Grimberg project as a whole. Therefore, Grimberg's assertion that the various criteria, *e.g.,* 100,000 sq-ft, $12 million cost, at least nine stories, building age of sixty years, etc., were *specific requirements* is incorrect. In fact, one Grimberg project "failed" to equal the South Wing project on several of the criteria, but the contracting officer nevertheless determined that the project was of comparable size and complexity with the South Wing project. A contracting officer who must exercise some level of discretion to determine a contractor's responsibility should be encouraged to base this exercise of discretion on objective, identifiable factors. Doing so does not make those factors special standards.

■ Grimberg argues alternatively that if the eleven Comparison Chart criteria are not special standards, then the solicitation's requirement that bidders submit three projects "of the size and complexity" of the South Wing project is improper because it is not specific and fails to put contractors on notice of what exactly was required. A valid special standard must be specific, objective, and mandatory. *See In re Weldtest, Inc.,* Comp. Gen. Dec. B–216747.2, 84–2 CPD ¶ 612 (1984) (holding that a solicitation provision stating that a bidder "may be required to prove that they have experience in comparable work" was permissive and not sufficiently specific nor objective to be a special standard); *In re Watch Security, Inc.,* Comp. Gen. Dec. B–209149, 82–2 CPD ¶ 353 (requirement that a bidder "furnish . . . written evidence of his satisfactory performance during the entire six (6) calendar months immediately prior to the date of this Invitation for Bids, of operations *similar in scope and type* to

those required in this Invitation, in an industrial plant, office building, or Federal reservation within the southeastern United States" is a valid special standard (emphasis added)); *In re J. Baranello & Sons,* Comp. Gen. Dec. B–192221, 79–1 CPD ¶ 322 (1979) (requirement that, *inter alia,* contractor "have installed, on at least two prior projects, elevators which are comparable to those required for this project" is a valid special standard). On these facts, however, we conclude that the solicitation was sufficiently specific and did provide Grimberg with reasonable notice of what would satisfy the special standard. For example, the similar "size" requirement placed Grimberg on notice that the contracting officer would consider factors such as the total square footage, total cost, and number of stories of its previous projects. Of Grimberg's four submissions, however, only one project equaled or exceeded the South Wing project in terms of square footage, whereas two projects fell far (over 45 percent) short. And although Grimberg bid over $14 million for the South Wing project, three of its four submissions had a project cost under $9.1 million. To the extent that Grimberg had questions about what the special standards required, it should have asked the contracting officer for clarification. *Cf. In re EPCo Assoc.,* B–238015, 90–1 CPD ¶ 388 (1990) ("We think that by failing to raise this alleged problem until after it[ ] . . . failed the test, [the contractor] bore the risk that its failure would not be excused.").

Finally, during oral argument Grimberg asserted that even if the *size* of its prior projects was not equivalent to the South Wing project, "size and complexity" should be evaluated together as a single standard, and that its projects meet this combined requirement. However, we have not found facts supporting this assertion in our review of the record. In any case, we conclude that the "size and complexity" special standard requires just what it says: that Grimberg demonstrate that its prior projects are comparable in both "size" *and* "complexity" to the South Wing project.

Because we have already determined that Grimberg was placed on notice but failed to meet the comparable "size" requirement, we need not further address its claims regarding the relative complexity of its submitted projects.

B

Grimberg also argues that the court erred by finding that the USDA did not act illegally when it chose not to ask Grimberg for additional information before finding Grimberg to be nonresponsible, and when it decided not to afford Grimberg the opportunity to cure its defective schedule or respond to concerns about its proposed project manager.

As support for this argument, Grimberg relies mainly on FAR 9.105–1(a), which states that "[b]efore making a determination of responsibility, the contracting officer *shall* possess or obtain information sufficient to be satisfied that a prospective contractor currently meets the applicable [general and special] standards...." 48 C.F.R. § 9.105–1(a) (1998) (emphasis added). Grimberg argues that, because members of the evaluation committee testified that they could not judge the adequacy of Grimberg's submitted projects against certain criteria in the Comparison Chart because its responsibility submission did not contain all the necessary information, the contracting officer had a legal obligation to obtain further information from Grimberg.

■■■ We disagree with Grimberg's reading of the regulation. Although FAR 9.105–1(a) does require the contracting officer to have, or to obtain, enough information to make a responsibility determination, the contracting officer is the arbiter of what, and how much, information he needs. *See id.* Because responsibility decisions are largely a matter of judgment, contracting officers are generally given wide discretion to make this decision. *See Trilon Educational Corp. v. United States,* 217 Ct.Cl. 266, 578 F.2d 1356, 1358 (1978); *Keco Indus.,* 492 F.2d at 1205. Thus, although the contracting officer is given the discretion to seek additional or clarifying

responsibility information from a contractor, he is not obligated to do so. *See In re Harvard Interiors Mfg.,* B–247400, 92–1 CPD ¶ 413 (1992). Therefore, even though a few grids on the Comparison Chart were left blank, the contracting officer could have found that the information that was available was sufficient to make the ultimate decision of nonresponsibility. Similarly, the contracting officer may allow a contractor to cure problems related to its responsibility, but he may also properly make a nonresponsibility determination based on the existing record, without giving the contractor an opportunity to explain or defend against adverse evidence. *See In re EPCo Assoc.,* B–238015, 90–1 CPD ¶ 388 (1990). Of course, courts may review such decisions by the contracting officer for an abuse of discretion; to the extent that Grimberg makes such an argument, however, we reject it for the reasons already set forth.

Finally, we note that Grimberg was deemed nonresponsible for failure to satisfy the "project management experience" special standard. Grimberg's only challenge to that ground for rejection is its claim of right to cure the defect with supplemental information. Since we reject that claim of right, we must conclude that Grimberg's rejection is lawful based solely on this ground.

III

Because we agree with the trial court that the Comparison Chart criteria were not special standards, and that the contracting officer was not required to seek additional information from Grimberg prior to making his decision of nonresponsibility, we affirm.

COSTS

No costs.

*AFFIRMED.*