**NEWS PRINTING COMPANY, INC., Plaintiff,**

v.

**The UNITED STATES, Defendant,**

and

**GraphicData, LLC, Intervenor.**

No. 00–262C.

United States Court of Federal Claims.

June 8, 2000.

---

William J. Spriggs, Washington, D.C., for plaintiff. David J. Taylor, Edward W. Gray, Jr., and Christopher E. George, Washington, D.C., of counsel.

Russell A. Shultis, with whom were Acting Assistant Attorney General David W. Ogden, David M. Cohen, and Donald E. Kinner, Washington, D.C., for defendant.

Richard D. Lieberman, Washington, D.C., for intervenor. Karen R. O'Brien, Washington, D.C., of counsel.

## OPINION

BRUGGINK, Judge.

This bid protest is before the court on the parties' cross-motions for summary judgment pursuant to Rule 56.1 RCFC. News Printing, Inc., the plaintiff, challenges award of the contract to GraphicData, LLC, the intervenor. The administrative record is complete, the motions have been fully briefed, and oral argument was held on June 6, 2000. The case presents the question of whether the invitation for bids should be construed in such a way that the putative awardee had to demonstrate actual compliance with the substantive specifications as part of the pre-award responsibility determination. While such a result would be novel, the wording of the solicitation gives the plaintiff room to make the argument. Nevertheless, for the reasons set forth below, we grant the government's motion for summary judgment and deny the plaintiff's corresponding cross-motion.

## FACTS

On February 17, 2000, the Government Printing Office (GPO) issued an Invitation for Bids (IFB) for a requirements contracts for Program D306–S. The work solicited concerns the printing of patents issued by the Patent and Trademark Office (PTO). Thus, although the GPO is the contracting entity, the real interested party is the PTO. The contract was to run from April 1, 2000, until March 31, 2001, with two possible twelve-month extensions. The IFB was amended twice on March 2, 2000. One effect was to extend the opening of bids from March 14 to March 17, 2000.

Certain provisions of the IFB are critical to News Printing's claim. They concern what occurs with respect to the putative low bidder during the time between bid opening and award. The most important is the section dealing with a pre-award test:

The contractor shall, during the Government's pre-award on-site visit, be required to produce from a Government furnished tape, copies of 100 patents, in accordance with these specifications. The tape will be furnished the morning of the test. The samples produced during the test run will be inspected for conformance to image position as stated under Quality Assurance Levels and Standards (page 2), and to Quality Attribute Level III.

The Government will approve, conditionally approve, or disapprove the samples within 2 workdays of the receipt thereof. Approval or conditional approval shall not relieve the prospective contractor from complying with the specifications. A conditional approval shall state any further action required by the contractor. A notice of disapproval shall state the reasons therefor.

. . .

In the event compliance with the specifications cannot be demonstrated by the prospective contractor they shall be declared nonresponsible.

The second IFB provision at issue requires the low bidder to submit for government approval a written quality control program addressing seven specific factors. The quality control program was to be submitted within five days of the prospective contractor being notified that it was the low bidder.

The third provision at issue concerns Exhibit F, which is a form attached to the IFB dealing with how the contractor will capture billing data. The IFB states that: "The contractor shall be required to submit during the pre-award survey evidence of their ability to meet the requirements of Exhibit F."

In summary, News Printing contends that these three provisions of the IFB constitute definitive responsibility criteria; that the agencies did not apply these criteria to GraphicData; and that GraphicData in fact did not meet these requirements. Because, according to News Printing, the section dealing with the pre-award survey incorporates directly the substantive requirements of the contract, it is necessary to summarize the work called for.

Section 2 of the IFB, entitled "Specifications," sets forth the manner in which pat-

ents are to be printed and distributed. The IFB states that the contractor must be able to produce between 1,500 and 5,000 patents a week. In abbreviated form, the patent printing process works as follows: The PTO, through its Patent Data Capture Contractor, supplies the printing contractor with 8mm Exabyte tapes containing the "Patent Postscript" data, i.e. the information that makes up the substance of the patent. The agency also furnishes *computer files for* "Classification Label tape." The IFB states that the classification label files [1] are "necessary in order to print the appropriate information on the front page of the patent and then sort the finished documents for delivery." The printing contractor is then responsible for extracting this data and producing the several types and forms of patents, with a classification label printed in the upper-left corner of the first page of each.[2]

The classification label is an important part of the patent printing process, as it controls how the finished patents are sorted and delivered. Before it was amended, the original IFB stated the following about labeling:

Prior to final and full implementation of the label printing process, the contractor shall at a minimum perform the following testing in conjunction with PTO personnel. For no less than three issues the contractor shall provide lists of printed label facsimiles for patents in selected Art Units to be determined by the government. In addition, the government may also request that actual patent copies containing the printed filing label be provided for approximately one to three Art Units to be determined by the government. For a minimum of two issues, the contractor shall provide lists of printed label facsimiles for all patents in those issues. The contractor may also be asked to provide a sample of their ability to correctly fulfill the Government's sorting and boxing requirement. Final implementation of the new process will not occur until the Government deter-

mines that all label printing is correct and accurate and that sorting and boxing will occur as required.

On March 2, 2000, the above portion of the IFB was deleted by Amendment No. 2 and replaced with the following:

Prior to the commencement of the first print order, the PTO may require a test of the classification label printing and subsequent sorting capabilities of the contractor. The PTO will assist in the start-up of the label processing by having technical personnel available to answer any questions concerning the details of this requirement.

The work called for is not new, although the particulars of the work have changed materially in the most recent solicitation. Both News Printing and GraphicData have experience with prior contracts. News Printing was the incumbent at the time of the solicitation and had the prior contract for three years. That award was contested and is the subject of *GraphicData, LLC v. United States*, 37 Fed.Cl. 771 (1997). Previously, GraphicData had the printing contract for a seven year period. As to the present solicitation, both News Printing and GraphicData submitted timely bids. GraphicData was the low bidder at $1,762,549.89. News Printing was next low bidder at $1,870,938.18.

On March 28, 2000, a pre-award survey team, headed by Supervisory Printing Specialist Patrick Morrissey and consisting of officials from the GPO and PTO, conducted a pre-award survey at GraphicData's facility in Burlington, New Jersey. During the survey, GraphicData was given a data tape and told to produce 100 patents, without classification labels. Very little direct evidence exists as to the conduct or results of the testing. Apparently Mr. Morrissey and his team did not take notes and were content with eyeballing the results of the test run.

The Contracting Officer (CO) relied on Mr. Morrissey and the others conducting the pre-award test. In his recommendation to the

---

1. Five types of computer files, all with a different function in creating the classification label, are supplied to the contractor.

2. The printing contractor is also responsible for a variety of other tasks related to the printing of newly-issued patents (e.g. the printing of Certificates of Correction, etc.). These contract requirements are not implicated in this action.

contract review board, the CO indicated that GraphicData, although in his view not required to do so, volunteered to print a run of patents that included classification labels:

> [a]ll requirements of the contract were reviewed and discussed with Graphic Data personnel with special emphasis on the weekly issue labeling requirements of the contract.
>
> . . . .
>
> In accordance with contract terms a pre-award test was conducted during the pre-award survey. The test consisted of loading an 8mm Exabyte Government tape into the contractor's system and running off 100 patents. The contractor completed this requirement with no problems. In addition to running the 100 patents Graphic Data also printed label data (weekly issue labeling requirement) in the upper left corner of the patents. The printing of the label data was not part of the pre-award test, however, Graphic Data voluntarily ran the labels to demonstrate their complete understanding of all contract requirements.

AR at 95.

This is supported by a one page document furnished by Mr. Morrissey to the CO entitled "Question, Answers & Observations." In it, he recites that "[d]uring the plant tour, the contractor ran some patents with the labeling requirement in place (this was not required as a part of the pre-award test). The PTO personnel inspected the samples with the labeling and all agreed that GraphicData had a very good understanding of what was required to do the labeling." In one of his three affidavits, Mr. Morrissey states that the "sample patents that GraphicData produced did not place a label that corresponded to the patent upon which it appeared."

Only a few of the sample patents still exist. Plaintiff points out that they are printed in "duplex" form, i.e., front and back, whereas the specifications call for only part of a patent to be printed in duplex form. This also resulted in the front of one patent sometimes being printed on the back of another patent. The paper used in the test run was "soft" paper, not the hard stock required by the contract for final copy, as the government

concedes. This series of deviations from the performance specifications prove, according to News Printing, that the agencies waived the contract specifications during the test.

The CO's memo of March 29 also addresses, in brief form, the other two pre-award requirements plaintiff questions: "During the pre-award survey Graphic Data demonstrated their ability to meet the following contract requirements: ... the ability to meet the requirements of Exhibit F (electronic billing). In addition, both the Quality Assurance Plan and Security Plan were reviewed, discussed, and approved."

In the litigation record, Mr. Morrissey's May 18 affidavit provides a bit more detail as to how he came to the conclusion that GraphicData satisfied the requirement of showing its "ability to meet the requirements of Exhibit F." He recites that he relied on the knowledge of a Mr. Gerry Groeber, an official with the PTO, and a member of the pre-award survey team: "Based upon his knowledge of GraphicData's prior performance, Mr. Groeber stated that GraphicData was capable of performing the 'itemized statement for billing generated from electronic input' requirement." In short, GraphicData was not required to actually produce a sample billing in accordance with Exhibit F.

The CO concluded his report by recommending that Graphic Data be awarded the procurement for project D306–S in part because of their "full understanding of contract requirements." On March 30, 2000, Graphic Data was awarded the contract and GPO issued the first purchase order.

It is apparent that the agency viewed the pre-award test, the ability to bill electronically, and the submission of a quality plan as *general,* rather than definitive responsibility criteria. The GPO and the PTO were satisfied that GraphicData had the ability and the equipment to do what it said it would. In addition, GPO relied, at least in part, on circumstantial evidence of GraphicData's ability to perform.

Newsprinting offered into the record certain events which occurred after the award, asserting that they are relevant to the selection process. For example, it asserts that

GraphicData was allowed to commence performance one week late. The printing run for that first week of the contract was added to incumbent News Printing's contract. It also asserts that GraphicData was ten days late in completing delivery of the weekly printing run for the week of April 18. That run, according to plaintiff, contained several defects. Three patents had portions of other patents mistakenly stapled to them, and at least five did not have front pages.

On March 31 News Printing filed a protest with the General Accounting Office (GAO) of the award of the contract to GraphicData. That protest was dismissed on May 2, 2000. The GAO held, among other things, that News Printing was challenging GPO's responsibility determination, and that the responsibility issues raised in News Printing's challenge were of a general nature (i.e., not definitive responsibility criteria) and therefore not subject to review.[3] The plaintiff filed the instant action on May 5, 2000.

## DISCUSSION

Newsprinting presents three main rationales in support of its bid protest: (1) that the government improperly conducted and evaluated the pre-award test; (2) that GraphicData did not produce a Quality Assurance Program (QAP) that met the contract requirements, and; (3) that GraphicData did not produce any evidence of its ability to generate a computer listing for billing requirements (Exhibit F).

At the outset, we can observe that plaintiff is correct that GraphicData was not called upon during the pre-award test to actually comply with all contract specifications. Nor was it required to demonstrate its billing capabilities. Whether that was legal error remains to be determined.

Each of plaintiff's arguments is grounded in the assumption that the contract requirements to which it refers are "definitive responsibility criteria," and not general responsibility criteria. If News Printing is correct,

then the court's role in the procurement is considerably greater than it would be if plaintiff is not correct. If plaintiff is correct, the court's role is akin to what it would be if the plaintiff were asserting that the awardee had submitted a non-responsive bid—the court would conduct its review under the standards of the Administrative Procedures Act,[4] i.e., whether the decision to award was arbitrary, capricious, or not in accordance with law. Moreover, in that latter circumstance, the parties' substantial disagreements about whether, in fact, the intervenor "passed" the pre-award test would have to be addressed. If it is wrong, then these allegations are, for all practical purposes, not reviewable here, in the absence of an allegation of fraud or bad faith. Neither fraud or bad faith has been alleged.

In short, the threshold-and potentially dispositive-question is purely one of law: Can the court review the alleged deficiencies because they relate to definitive responsibility requirements? Only if the answer is "yes," must the court proceed.

The pre-award determination of a bidder's capability of performing the contract is normally referred to as the "responsibility" inquiry. The applicable regulations are set out in Subpart 9.1 of the Federal Acquisition Regulations. Responsibility is typically contrasted with "responsiveness," which focuses on the bid, rather than the bidder. The difference is captured in the following definitions:

> Responsibility—The ability of a bidder to properly perform contract work.
>
> Responsiveness—A bid's conformity with, and commitment to meet, the material terms of an invitation for bids.

D. Arnavas and W. Ruberry, Government Contract Guidebook p. GL–17 (2d ed.1994).

There are two types of responsibility standards recognized in the regulations, general and special. General responsibility standards are discussed at 48 C.F.R. § 9.104–1. Seven mandatory elements are set out, six

**3.** We note that while the GAO bid protest decision in this matter is entitled to deference to the extent it deals with the same issues, it does not preclude a separate action here. Consequently, News Printing is correct that its bid protest is entitled to a fresh consideration.

**4.** 5 U.S.C. § 706 (1994); 28 U.S.C. § 1491(b)(4).

specific and one catch-all. They all focus on the same overall inquiry: Is the bidder capable of performing the work? Thus the CO is required to use her best judgment in assessing such characteristics as financial strength, prior track record, and organizational skills. Most relevant here, the CO has to be satisfied that the contractor has the necessary "production ... and technical equipment and facilities, or the ability to obtain them." 48 C.F.R. § 9–104–1(f).

■■■■ When it is "necessary for a particular acquisition," the IFB can set out "special standards" of responsibility. *Id.* at 9.104–2 The regulations suggest that they might be particularly desirable when unusual expertise or specialized facilities are needed. *Id.* Such standards are typically referred to as definitive responsibility criteria. A recent decision of the court has stated:

> [D]efinitive responsibility criteria [are] specific and objective standards established by an agency for use in a particular procurement for the measurement of a bidder's ability to perform the contract. These special standards of responsibility limit the class of bidders to those meeting specified qualitative and quantitative qualifications necessary for contract performance.

*Chas. H. Tompkins Co. v. United States,* 43 Fed.Cl. 716, 720 (1999). For example, a requirement that a contractor produce documentation demonstrating three projects of similar scope to the IFB has been held to be a definitive responsibility criterion. *See M & M Welding and Fabricators, Inc.,* B–271750, 96–2 C.P.D. ¶ 37, 1996 WL 413250 at *3. The CO can only impose special standards, however, if they are "set forth in the solicitation (and so identified)." Two characteristics thus mark a definitive responsibility criteria. They must be specific and objective, and the bidders have to be warned of them.

■■■■ This exercise in taxonomy matters. The presumption against special standards

translates into a presumption of non-review of responsibility determinations. At the GAO, this presumption appears in the applicable regulations. *See* 4 C.F.R. § 21.5(c). The same presumption has arisen in cases of judicial review. General responsibility determinations will not be overturned, absent allegations of fraud or bad faith. *See Trilon Educational Corp. v. United States,* 217 Ct. Cl. 266, 271, 578 F.2d 1356 (1978). "A contracting agency has broad discretion in making responsibility determinations since it must bear the brunt of difficulties experienced in obtaining the required performance. Responsibility determinations are of necessity a matter of business judgment and such judgments must, of course, be based on fact and reached in good faith." *In re House of Communications & Graphics,* B–245920, 1992 WL 55054 at *2 (Comp.Gen.1992). Only if the responsibility standards are "special" or "definitive responsibility criteria," is the court able to do a typical bid protest review for abuse of discretion. *See John C. Grimberg Co. v. United States,* 185 F.3d 1297, 1303 (Fed.Cir.1999).

■■ The question of compliance with Exhibit F can be addressed in short order. The IFB requires the contractor to submit during the pre-award survey "evidence of their ability to meet the requirements of Exhibit F." Contrary to plaintiff's characterization, there is nothing about this directive which suggests that it is anything other than the typical inquiry under § 9.104–1(f), concerning the contractor's possession of the necessary equipment to do the work. The IFB does not refer to production of a sample bill, but to the "ability" to do billing. While ability could be demonstrated by an actual run, that is not the only way it can be shown. The CO's determination of whether that requirement is met is thus not subject to judicial scrutiny because the court would have no objective criteria to determine whether the CO's assessment is correct when it is based, as it can be, on circumstantial proof.[5]

---

5. Even if plaintiff were correct that this constituted a definitive responsibility criteria, its wording suggests the need for substantial flexibility in the CO. As the Comptroller General's office has noted:

> Literal compliance with definitive responsibility criteria is not required where there is evidence that an offeror has exhibited a level of achievement equivalent to the specified criteria. Whether sufficient evidence exists to conclude that an offeror has met such a criterion

■ For similar reasons, we reject plaintiff's contention that the requirement for submission of a QAP is a specialized standard. News Printing contends that the requirement that the plan "address" a minimum of seven elements provides the objectivity and specificity contemplated. We disagree. The fact of submission of a plan may be subject to objective inquiry, but the objectivity ends there. The contents of such a plan (e.g., how verification will be accomplished) are clearly not a "specified qualitative [or] quantitative qualification necessary for contract performance." *Tompkins,* 43 Fed.Cl. at 720. A determination of whether the plan "addresses" these elements is plainly one that is inherently subjective. Succumbing to plaintiff's invitation to second guess the CO's conclusion that the plan addressed the seven minimum elements would result in precisely the type of review from which we are foreclosed.[6]

■ Plaintiff's better argument concerns the pre-award test. As to this element, bidders were put on notice that failure to satisfy the test would result in a finding of nonresponsibility. Whether that meets the requirement of notice, however, is difficult to separate from the question of whether the performance being tested is sufficiently objective and specific. Plainly bidders were on notice that responsibility *vel non* was at stake. It is less than clear that they were on notice that they had to be able to perform the contract even before award.

With respect to the search for objective and specific criteria, plaintiff points to the language in the IFB that the contractor must "produce from a Government furnished tape, copies of 100 patents, in accordance with these specifications." Failure to do so (leaving room for retries) renders the bidder nonresponsible. News Printing contends that the phrase "these specifications" incorporates

all performance requirements of the contract, and that, because many of the specifications are specific and objective, the pre-award test becomes a definitive responsibility criteria. The pre-award test advanced by plaintiff-which would require tangible demonstration of the ability to comply with *every* term of contract performance-is akin to complete performance itself.

This argument is a novel one. Counsel for News Printing candidly conceded that he was unaware of any decisions in which the ability to demonstrate actual performance was treated as a special standard, and thus subject to court or GAO review. The inertia against this construction is significant, because it runs directly contrary to the larger regulatory and judicial edifice that has evolved distinguishing questions of responsiveness, responsibility, and contract performance.

The full import of plaintiff's argument has to be seen in stark relief at this point. It contends that *every* element of the specifications and the incorporated quality standards had to be met. The court asked plaintiff's counsel the following question at oral argument: "Does that mean that every single specification becomes a definitive-responsibility requirement insofar as it can be tested by a run of 100 patents?" His response was, "[y]es." As discussed below, counsel suggested that this was not literally the case,[7] but, if anything, this lack of comprehensiveness adds to the difficulty.

The court's concerns are not based in its inability to find objective and specific criteria in the IFB specifications section. Indeed there is no shortage of such requirements that the protestor could mine for deviations. The specifications section discusses the complicated process for the production of certificates of correction and withdrawn patents. They also contain requirements for the band-

---

is subject to considerable discretion; the relative quality of the evidence is a matter for the judgment of the contracting officer to determine.

*In re HAP Constr., Inc.,* B–278515, 98–1 C.P.D. ¶ 48, 1998 WL 48704 at *3. "The relative quality of the evidence is a matter for the contracting officer." *In re Roth Brothers, Inc.,* B–235539, 89–2 C.P.D. ¶ 100, 1989 WL 241071 at *2.

6. Nor are we willing to set aside the procurement simply because the CO granted a four day extension of time for the submission of the QAP.

7. For example, the IFB calls for the printer to be able to print between 1,500 and 5,000 patents a week, yet the pre-award test calls for only 100 sample patents.

ing, packing and distribution of patents. The specifications contain a great deal of detail as to the physical appearance of the printed product. In addition, the general terms and conditions contains a "Quality Assurance Levels and Standards" clause which, in turn, incorporates by reference detailed requirements as to the quality of the final product. These levels and standards are then incorporated by reference into the pre-award test clause, which states that the samples produced during the test run "will be inspected for conformance to image position as stated under Quality Assurance Levels and Standards (page 2), and to Quality Attribute Level III."

By way of illustrating the objectivity and specificity of the performance requirements, during oral argument, counsel for News Printing introduced an excerpt from what the court understands to be one of the quality standards applicable to the printing of patents along with the classification labels. The excerpt is three pages long, although the document itself is over forty pages long. It describes, apparently in some detail, printing attributes and finishing attributes. In plaintiff's view of the protest, each of the detailed specifications in the IFB itself, as well as all the specific quality standards incorporated in the quality assurance clause, had to be applied, to the extent practicable, during the pre-award test.

In short, no doubt the parties would agree that a neutral observer could, in effect, look over Mr. Morrissey's shoulder and determine whether certain performance specifications were satisfied in the pre-award test, for example, the font requirements. Yet the very multiplicity of potential defects is the undoing of plaintiff's argument. The fact that the plaintiff is able to isolate certain specifications which are unquestionably objective and quantifiable, i.e., subject to third party scrutiny, is not, under these circumstances, sufficient to permit the conclusion that the pre-

award test is a definitive responsibility requirement itself. Although most of the specifications are precise, the court would not be in a position, for example, to determine the arbitrariness of the CO's determination that "[r]ubber bands [were] of sufficient strength to hold patents in groups without causing damage to the patent pages," or that shipping containers were "packed solidly."

These are the types of issues that must be addressed during performance.[8] We hold that the disputed criteria *in its entirety* must be objective and specific, not simply portions of it.

Plaintiff's concession that not all of the performance specifications could be applied during a pre-award test is telling in this regard. If some aspects of contract performance were not practicable to be tested at the pre-award test and thus not required, then what particular aspects of the extensive specifications section was GraphicData required to demonstrate at the pre-award test? This uncertainty in itself is sufficient to preclude a finding that the pre-award test was a definitive responsibility criteria.

While the court cannot rule that such a definitive responsibility criteria is inconceivable, it is sufficient to dispose of the present suit to rule that, if the agency wanted to incorporate actual performance of the substantive specifications as part of the pre-award responsibility determination, it had to do so more clearly. The most natural reading of the pre-award language is that the agency wanted to satisfy itself as to the *capability* of the putative bidder to perform the contract, based on its best judgment as to how good a job the bidder did in printing a sample of 100 patents. Such a construction is fully consistent with the general responsibility inquiries set out in the regulation. *See* 48 C.F.R. § 9.104–1(f).

Having concluded that the pre-award test did not create any sort of special standard, it

8. News Printing has suggested that GraphicData has, since the award of the contract, been deficient in its performance. The government and GraphicData disagree. The court will assume, for purposes of this ruling, that News Printing has evidence to support its assertion that GraphicData has not performed flawlessly. Plaintiff's

allegations in this respect are irrelevant. To the extent that the asserted deficiencies concern performance or lack thereof after award, they are beyond the scope of a bid protest. It is the government's obligation to enforce performance standards once the award is made.

then becomes part of the contracting officer's subjective responsibility determination. *See Tompkins*, 43 Fed.Cl. at 720–21. As such, his finding that GraphicData successfully completed the pre-award test is not reviewable absent fraud or bad faith, not alleged here.

## CONCLUSION

Plaintiff's cross-motion for summary judgment is denied. Defendant's motion for summary judgment is granted. The complaint is dismissed. Each side to bear its own costs. The clerk is directed to enter judgment accordingly.