# United States Court of Appeals for the Federal Circuit

2008-5183

TIP TOP CONSTRUCTION, INC.,

Plaintiff-Appellant,

v.

UNITED STATES,

Defendant-Appellee.


Michael A. Gordon, Michael A. Gordon PLLC, of Washington, DC, argued for plaintiff-appellant.

Amanda L. Tantum, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, of Washington, DC, argued for defendant-appellee. With her on the brief were Jeanne E. Davidson, Director, and Harold D. Lester, Jr., Assistant Director.

Appealed from: United States Court of Federal Claims

Judge Lynn J. Bush

# United States Court of Appeals for the Federal Circuit

2008-5183

TIP TOP CONSTRUCTION, INC.,

Plaintiff-Appellant,

v.

UNITED STATES,

Defendant-Appellee.

Appeal from the United States Court of Federal Claims
in 08-CV-352, Judge Lynn J. Bush.

_____

DECIDED:  April 29, 2009

_____

Before MICHEL, <u>Chief Judge</u>, BRYSON, <u>Circuit Judge</u>, and POSNER, <u>Circuit Judge</u>.[*]

BRYSON, <u>Circuit Judge</u>.

In this bid protest case, the unsuccessful bidder claims that the contracting officer improperly rejected its bid on the ground that the bid was not accompanied by a satisfactory bid bond.  The Court of Federal Claims dismissed the bidder's protest action because the asset pledged by the bidder's surety was not acceptable.  We agree with the court that the bidder did not pledge an acceptable asset and therefore affirm.

---

[*]    The Honorable Richard A. Posner, Circuit Judge, United States Court of Appeals for the Seventh Circuit, sitting by designation.

In 2007, the Federal Highway Administration ("FHWA") issued an invitation for bids for the construction of a traffic circle and related work on the island of St. John in the U.S. Virgin Islands. The solicitation required bidders to submit a bid bond in the amount of either 20 percent of the bid price, or $3 million (whichever was less), and it allowed bidders to use individual sureties to provide the bid bond. The appellant, Tip Top Construction, Inc., submitted a bid. Of the three bids submitted, Tip Top's was the lowest. The contracting officer rejected Tip Top's bid, however, on the ground that Tip Top's bid bond did not comply with the requirements of the Federal Acquisition Regulation ("FAR") pertaining to bid bonds.

Tip Top used Edmund C. Scarborough as an individual surety to furnish its bid bond asset. As required by the solicitation, Mr. Scarborough submitted a bid bond, an Affidavit of Individual Surety, and a Certificate of Pledged Assets. In the Certificate of Pledged Assets, Mr. Scarborough identified the proffered asset as an "allocated portion of $191,350,000.00 of previously mined, extracted, stockpiled and marketable coal, located on the property of E.C. Scarborough" in West Virginia.

In a letter dated February 19, 2008, the contracting officer rejected Tip Top's bid on the ground that marketable coal was not an acceptable bid bond asset under the FAR. The contracting officer offered this explanation for rejecting the bid guarantee:

> We have reviewed the Bid Bond submitted with your Bid in response to the subject Invitation for Bid and find it to be inadequate. It does not meet the requirements of the Federal Acquisition Regulations (FAR) for an Individual Surety at Section 28.203. Individual Surety Bonds must be supported by acceptable assets, as listed in the FAR. Acceptable assets include cash, United States Government securities, stocks and bonds that are actively traded, real property owned in fee simple, and irrevocable

letters of credit. Speculative assets – which would include marketable coal – are specifically excluded by Subsection 28.203-2(c)(7).

Your bid is hereby rejected in accordance with FAR Section 14.404-2(i), failure to furnish a bid guarantee in accordance with the requirements of the invitation for bids.

On February 20, 2008, Tip Top's president, Percy J. Hollins, sent an email to the contracting officer requesting the opportunity to "clarify" the assets listed on the bid bond and noting that the "bid bond entity has other marketable assets including cash." In an affidavit filed during the litigation, Mr. Hollins asserted that he followed up that email with a telephone call to the contracting officer. In his affidavit, he stated that in the course of the telephone call he offered to have the surety substitute a different asset, but that the contracting officer told him that "the FARs would not allow for a substitute asset by the individual surety and that she would not accept it."

On February 21, 2008, shortly after that telephone conversation, Mr. Scarborough's counsel sent a letter to the contracting officer arguing that the proffered coal was not, as the contracting officer had concluded, a speculative asset or otherwise unacceptable under the FAR. Mr. Scarborough offered to provide documentation as to the quality and market price of the pledged coal, and contended that other federal agencies had accepted coal as security for bid bonds.

The contracting officer responded by letter on February 26, 2008. In that letter, the contracting officer further explained why she had concluded that coal was not an acceptable bid bond asset under the FAR:

In our analysis, the asset listed in this instance – mined but not marketed coal – is closer in similarity to a corporate asset, speculative asset, or accounts receivable [which are listed as unacceptable assets in the FAR], than it is to cash, certificates of deposit, or U.S. Government securities [which are listed as acceptable assets in the FAR]. In any case, the determination of which category the proposed asset falls into belongs to

the Contracting Officer – as stated at FAR Section 28.203(a), "The contracting officer shall determine the acceptability of individuals proposed as sureties, and shall ensure that the surety's pledged assets are sufficient to cover the bond obligation."

The contracting officer stated that because Tip Top had failed to provide an acceptable individual surety in support of its bid guarantee, she was rejecting Tip Top's bid as nonresponsible under FAR 28.203(c), 48 C.F.R. § 28.203(c).

Three days later, Tip Top filed a protest with the Government Accountability Office ("GAO"). Tip Top sought a stay of performance of the contract, claiming that FHWA had failed to offer any reason not to accept marketable coal as a bid bond asset. In response, the FHWA contracting officer explained that she had concluded that the coal was a speculative asset because its actual value could not be ascertained until it was sold, its price could fluctuate depending on its quality and market conditions, and it would be a difficult asset for the government to liquidate quickly. Tip Top and the surety replied by submitting a document that described the type, grade, and value of coal materials owned by the IBCS Mining Corp., a company controlled by Mr. Scarborough. That document explained that the proffered coal was actually "coal refuse" that would need to be reprocessed prior to sale.

The GAO rejected the protest. It concluded that mined coal is an unacceptable asset because it could not be placed into an escrow account, as required for pledges of assets under FAR 28.203-1(b)(1). The GAO also rejected Tip Top's argument that under the circumstances of this case the contracting officer was obligated to accept a substitute bid bond asset.

Tip Top then filed a bid protest action in the Court of Federal Claims, seeking to enjoin the award of the contract. The court agreed with the GAO that mined coal is not

an acceptable asset under the FAR because it could not be placed into an escrow account. The court also determined that it was permissible for the FHWA to reject the bid bond without granting Tip Top's request for a substitution of assets.

II

On appeal, Tip Top makes three arguments: (1) that the contracting officer incorrectly concluded that the pledged coal was not an acceptable asset under the FAR, and that the Court of Federal Claims improperly substituted a new basis to affirm the agency's responsibility determination; (2) that the contracting officer was required to provide the surety an opportunity to support the pledged asset or submit a substitute asset; and (3) that the contracting officer erred in rejecting Tip Top's offer to provide a substitute asset. We consider each argument in turn.

A

The FAR requires contracting officers to determine the acceptability of individual sureties and provides that if "the contracting officer determines that no individual surety in support of a bid guarantee is acceptable, the offeror utilizing the individual surety shall be rejected as nonresponsible." 48 C.F.R. § 28.203(c). The trial court concluded that the pledged coal was not an acceptable asset because coal cannot be placed in an escrow account. In reaching that conclusion, the court relied in part on FAR 52.228-11, which provides that "Pledges of assets from each person acting as an individual surety shall be in the form of—(1) Evidence of an escrow account containing cash, certificates of deposit, commercial or Government securities, or other assets described in FAR 28.203-2 . . . and/or; (2) A recorded lien on real estate." 48 C.F.R. § 52.228-11(b); see also 48 C.F.R. § 28.203-1. The trial court also noted that the Affidavit of Individual

Surety specifically requires individual sureties to provide evidence of an escrow account for all assets other than real estate. The court therefore concluded that it was reasonable for the contracting officer to reject Tip Top's bid bond as unacceptable.

Tip Top contends that the escrow requirements set forth in the FAR do not apply to all types of acceptable assets, and that even if the escrow requirements apply to mined coal, those requirements could be satisfied by placing the coal in a bonded area in possession of a third-party escrow agent. Tip Top's principal argument, however, is that the contracting officer did not actually reject the proffered coal on the ground that it could not be placed in an escrow account, but rather concluded that the mined coal was unacceptable because it was a speculative asset. For that reason, Tip Top asserts, the trial court improperly affirmed the agency's rejection on a ground not invoked by the agency, in violation of the principle enunciated by the Supreme Court in SEC v. Chenery Corp., 332 U.S. 194, 196 (1947). See OMV Med., Inc. v. United States, 219 F.3d 1337, 1344 (Fed. Cir. 2000) (applying the Chenery doctrine in a bid protest case). The government disputes Tip Top's interpretation of the FAR's escrow requirement and contends that the Chenery doctrine is inapplicable in this case because the legal interpretation of a regulation such as the FAR is not "a determination or judgment which an administrative agency alone is authorized to make." Chenery, 332 U.S. at 196.

We need not determine whether the trial court's reliance on the FAR's escrow requirement was permissible under Chenery because the agency's rejection of Tip Top's bid bond is sustainable on the ground articulated by the contracting officer—namely, that the pledged coal was not the type of asset that is acceptable under the FAR as a bid bond asset. Section 28.203-2 of the FAR provides that the "government

will accept only cash, readily marketable assets, or irrevocable letters of credit from a federally insured financial institution from individual sureties to satisfy the underlying bond obligations." 48 C.F.R. § 28.203-2(a). That section of the FAR then lists specific assets that are acceptable or unacceptable in support of a bid bond:

> (b) Acceptable assets include—
> (1) Cash, or certificates of deposit, or other cash equivalents with a federally insured financial institution;
> (2) United States Government securities at market value. . . .
> (3) Stocks and bonds actively traded on a national U.S. security exchange with certificates issued in the name of the individual surety. National security exchanges are [limited to eight specified exchanges]. These assets will be accepted at 90 percent of their 52-week low, as reflected at the time of submission of the bond. Stock options and stocks on the over-the-counter (OTC) market or NASDQ Exchanges will not be accepted. . . .
> (4) Real property owned in fee simple by the surety . . . . These assets will be accepted at 100 percent of the most current tax assessment value (exclusive of encumbrances) or 75 percent of the properties' unencumbered market value provided a current appraisal is furnished (see 28.203-3).
> (5) Irrevocable letters of credit (ILC) issued by a federally insured financial institution in the name of the contracting agency and which identify the agency and solicitation or contract number for which the ILC is provided.
> (c) Unacceptable assets include but are not limited to—
> (1) Notes or accounts receivable;
> (2) Foreign securities;
> (3) Real property [having certain characteristics];
> (4) Personal property other than that listed in paragraph (b) of this subsection (e.g., jewelry, furs, antiques);
> (5) Stocks and bonds of the individual surety in a controlled, affiliated, or closely held concern of the offeror/contractor;
> (6) Corporate assets (e.g., plant and equipment);
> (7) Speculative assets (e.g., mineral rights);
> (8) Letters of credit, except as provided in 28.203-2(b)(5).

Id. at § 28.203-2(b), (c). In her February 19, 2008, letter rejecting Tip Top's bid, the contracting officer stated that the mined coal proffered by Mr. Scarborough was inadequate as a bid bond asset because coal is a speculative asset and as such is

unacceptable as a bid bond asset under FAR 28.203-2(c)(7). We agree with the contracting officer that the pledged coal was not an acceptable bid bond asset.

The purpose of a bid bond is to protect the government in the event that the bidder withdraws its bid. See, e.g., Interstate Rock Prods., Inc. v. United States, 50 Fed. Cl. 349, 358 (2001). Consistent with that purpose, the FAR defines the types of acceptable bid bond assets as those that have an identifiable value and are readily marketable, so that they can easily be sold to cover any expenses incurred by the government as a result of the bidder's failure to satisfy its obligation. See 54 Fed. Reg. 48,978 (Nov. 28, 1989). The distinction in the FAR between acceptable assets (such as cash, stocks, and bonds) and unacceptable assets (such as jewelry, antiques, and furs) reflects that concern with the discernible value and liquidity of pledged assets.

Tip Top argues that the contracting officer erred in concluding that mined coal is an unacceptable asset because coal is a readily marketable mineral with a known value that is defined by national price indices and because it is actively traded on commodities exchanges. But mined coal is clearly less liquid than cash, stocks, certificates of deposit, and bonds, which are highly liquid assets with readily identifiable values. Moreover, the fact that there is some market for a product does not mean that the product is readily marketable. It would obviously be permissible for a contracting officer to reject a proffer of frozen pork bellies, lean hogs, or oats on the ground that they are not readily marketable, even though those commodities—like coal—are routinely traded on commodities markets. Even stocks that are traded on the NASDAQ exchange are excluded from the FAR's list of acceptable assets, despite the well-defined market for

such stocks. Thus, the fact that coal has an identifiable spot price does not undercut the contracting officer's conclusion that coal is not an acceptable asset.

Mined coal is a speculative asset because its value is difficult to ascertain and is highly dependent on variables such as the type, quality, and provenance of the coal proffered. See 55 Fed. Reg. 4499, 4500 (Feb. 8, 1990) (noting that "speculative" assets include art, antiques, jewelry, and furs). Tip Top's own submissions show that coal value depends on ash content, sulfur content, BTUs, transportation costs, and processing costs, as well as regular market fluctuations and other factors. Those variables—and how they interact to affect asset value—may not be readily ascertainable. Notably, the FAR provides a mechanism to value stocks and bonds that minimizes the risk of fluctuation in those assets' value: Those assets are accepted at 90 percent of their 52-week low. 48 C.F.R. § 28.203-2(b)(3). The FAR provides no comparable method to determine the value of a commodity such as coal in a way that would protect the government against fluctuations in coal values.

Consequently, pledges of assets such as mined coal place a greater burden on the contracting officer and present a greater risk of loss to the government. The risks inherent in accepting speculative assets in support of a bid bond are illustrated by this case, as it became evident in the GAO proceedings that the pledged coal actually consisted of coal refuse that would likely require further processing before it could be liquidated. The purpose of the FAR provisions on bid bond assets is to prevent precisely that type of surprise. A contracting officer should not have to be an expert on the market for particular commodities in order to evaluate the value and liquidity of a pledged asset.

The government observes that FAR 28.203-2 categorizes "[p]ersonal property other than that listed in paragraph (b) of this subsection (e.g., jewelry, furs, antiques)" as unacceptable. 48 C.F.R. § 28-203-2(c)(4). Because coal is personal property and is not specifically listed in FAR 28.203-2(b), the government contends that mined coal is necessarily excluded by the FAR as an unacceptable asset. Tip Top's sole answer to that argument is to suggest that if the assets listed in FAR 28.203-2(b) were the only ones acceptable to satisfy a bond obligation, it would be superfluous for the FAR to enumerate several types of unacceptable personal property in subpart (c). But the fact that the FAR drafters decided to provide concrete examples of personal property that are deemed to be unacceptable (such as notes or foreign securities) does not speak directly to whether any personal property not listed in FAR 28.203-2(b) can be an acceptable asset to satisfy a bond obligation.

Tip Top emphasizes that contracting officers are typically afforded broad discretion when making surety financial responsibility determinations. See, e.g., Santurce Constr. Corp., 70 Comp. Gen. 133, 135 (1990) ("The contracting officer is vested with a wide degree of discretion and business judgment in determining the acceptability of an individual surety."). A hard-and-fast exclusion of all personal property not listed in FAR 28.203-2(b) could unduly limit that exercise of discretion. We do not need to decide whether the list of acceptable assets in FAR 28.203-2(b) excludes all personal property not specifically enumerated in that subsection, however. At a minimum, mined coal is unacceptable personal property; coal is clearly less like cash, stocks, or bonds, and more akin to jewelry, furs, and antiques. Thus, the

contracting officer correctly concluded that the coal asset pledged in this case was not acceptable to support Tip Top's bond.

B

Tip Top relies on the GAO's decision in Gene Quigley, Jr., 70 Comp. Gen. 273 (1991), for the proposition that before rejecting its bid the contracting officer was obligated to provide Tip Top an opportunity to supply additional information about the pledged asset or to offer a substitute asset. In Quigley, the contracting officer rejected individual sureties' pledges of real estate because, among other things, the sureties did not submit evidence of a lien pursuant to FAR 28.203-3(d). See 48 C.F.R. § 28.203-3(d). The GAO ruled that the contracting officer acted unreasonably in rejecting the sureties as unacceptable:

> [S]ince it should have been evident to the contracting officer that [the contracting officer's] objections might easily have been remedied if the protester were given the opportunity to do so, we think the contracting officer had an obligation to allow Mr. Quigley to obtain further explanations from the individual sureties regarding the pledged assets or to allow the sureties to pledge additional assets.

Quigley, 70 Comp. Gen. at 276. The trial court ruled in this case that the contracting officer was not required to make further inquiries into the nature of the coal asset. In reaching that conclusion, the court relied in part on our decision in John C. Grimberg Co. v. United States, 185 F.3d 1297 (Fed. Cir. 1999), in which we stated: "Because responsibility decisions are largely a matter of judgment, contracting officers are generally given wide discretion to make this decision. Thus, although the contracting officer is given the discretion to seek additional or clarifying responsibility information from a contractor, he is not obligated to do so." Id. at 1303 (internal citations omitted). Tip Top argues that Grimberg does not govern here because Grimberg involved a

contractor responsibility determination under FAR 9.1, whereas the issue in this case is whether the surety was responsible under FAR 28.203.

Regardless of whether <u>Grimberg</u> extends to surety responsibility determinations, the contracting officer's rejection letter of February 19, 2008, clearly put Tip Top on notice that its pledged asset was inadequate. In effect, the contracting officer informed Tip Top that if it wanted to secure the contract, it would need to either clarify why the pledged coal was acceptable or come up with another bid bond asset. Tip Top asserts that the contracting officer erroneously concluded that the offer by Mr. Scarborough's counsel to provide documentation supporting the quality of the pledged coal was untimely. However, the contracting officer later stated that "even if an independent proof of value and ownership had been provided, the asset would still be so speculative as to be unacceptable because of the liquidity issue." Thus, to the extent that the contracting officer erred in stating that the surety's offer was untimely, any such error was nonprejudicial. <u>See</u> <u>Bannum v. United States</u>, 404 F.3d 1346, 1358 (Fed. Cir. 2005) (plaintiff must show there was a substantial chance it would have received the contract award but for the agency's error in the procurement process).

C

Finally, Tip Top contends that the contracting officer unreasonably refused to accept a substitute asset when one was offered. FAR 28.203-4, entitled "Substitution of assets," provides (in relevant part):

> An individual surety may request the Government to accept a substitute asset for that currently pledged by submitting a written request to the responsible contracting officer. The contracting officer may agree to the substitution of assets upon determining, after consultation with legal counsel, that the substitute assets to be pledged are adequate to protect the outstanding bond or guarantee obligations.

48 C.F.R. § 28.203-4. On February 20, 2008, the day after the contracting officer's initial rejection letter, Tip Top's president, Mr. Hollins, sent an email to the contracting officer stating that "[t]he bid bond entity has other marketable assets including cash." Mr. Hollins asserts that he then spoke to the contracting officer on the telephone and explained that "the surety was willing to provide a substitute asset or cash in support of the bid bond we provided." Tip Top thus contends that it offered an acceptable substitute asset, which the contracting officer improperly refused.

As a threshold matter, it is clear that a contracting officer is permitted to agree to a substitution of assets but is not obligated to do so. See 48 C.F.R. § 28.203-4. Tip Top acknowledges that contracting officers have discretion to decide whether to accept substitute assets, but it contends that in this case the contracting officer erroneously believed that she was barred from exercising that discretion. According to Mr. Hollins, the contracting officer told him during their telephone conversation that she would not accept a substitute asset because the FAR "would not allow" her to do so. We agree with Tip Top that the contracting officer's statement, if made, would have been contrary to the governing regulation, as FAR 28.203-4 permits contracting officers to accept a valid offer to substitute assets.

As the trial court explained, however, FAR 28.203-4 requires that any request for a substitution of assets must be in the form of a formal written request from the individual surety. No such request was ever made in this case. The email from Mr. Hollins did not actually offer a substitution of assets, but merely referred somewhat obliquely to the fact that the surety "has other marketable assets." Moreover, that email came from the contractor and not, as the FAR requires, from the surety. Although Mr.

Hollins alleged that he told the contracting officer in his subsequent telephone call that Mr. Scarborough was willing to provide a substitute asset or cash, that statement was also made by the contractor and was neither a request made by the surety nor in writing, as required by the FAR. In short, there was never a valid request by the surety to permit a substitution of assets. Because there was no formal request by the surety to provide a substitute asset, there was no formal rejection of an offer for substitution, and the contracting officer's purported misunderstanding of FAR 28.203-4 is irrelevant. While the requirement that the surety submit the substitution request in writing may appear to be a technicality, it serves the important purpose—well illustrated by this case—of avoiding later disputes about what was said during informal contacts among the parties.

After the telephone conversation with the contracting officer, Tip Top seems to have let the matter drop. The letter sent by Mr. Scarborough's counsel to the contracting officer on February 21, 2008, addressed only the acceptability of coal as a bid bond asset. That letter made no mention of a possible substitution of assets, even though it was sent shortly after the telephone conversation in which Mr. Hollins allegedly requested a substitution of assets on Mr. Scarborough's behalf. It was incumbent on Tip Top to instruct its surety to make a formal written request to substitute assets. Having failed to arrange for its surety to make a proper request for a substitution of assets, Tip Top cannot now complain that the contracting officer impermissibly denied a request for substitution.

Tip Top contends that the contracting officer's rejection, based on a misunderstanding of the FAR, "slammed the door shut" on any future request to provide

a substitute asset. But the procurement process is a fluid one, and the contracting officer's decision not to accept a substitution of assets was not conclusive the moment she made the alleged comment over the telephone that the FAR does not allow substitutions. The fact that immediately after the telephone conversation Tip Top and its surety challenged the contracting officer's rejection of coal as an unacceptable asset shows that the contracting officer did not, in fact, dissuade Tip Top from responding to what it perceived as the contracting officer's erroneous interpretation of the FAR. Tip Top cites U.S. Floors, Inc., Comp. Gen. B-241552, B-241555 (1991), for the proposition that a request to submit a substitute asset can be made even after a protest is filed. Yet Mr. Scarborough made no such request in the letter sent to the contracting officer the day after the telephone conversation between Mr. Hollins and the contracting officer. There is therefore no basis for Tip Top's claim that "it is undisputed that the surety would have submitted" a substitute asset; the surety had the opportunity to offer a substitute asset but did not do so.

In sum, we agree with the agency that the proffered coal was not an acceptable bid bond asset under the FAR because coal is a speculative asset that is not readily marketable. We also conclude that the contracting officer did not impermissibly refuse to accept a substitute asset, because no valid offer to provide a substitute asset was made by Tip Top's surety. We therefore uphold the decision by the Court of Federal Claims dismissing Tip Top's bid protest action.

AFFIRMED.