**MG ALTUS APACHE COMPANY,**
Plaintiff,

v.

**The UNITED STATES, Defendant.**

No. 11–538C

United States Court of Federal Claims.

(Classified Opinion and Order
Filed: March 27, 2013)

(Filed Under Seal: May 24, 2013)

(Reissued: May 30, 2013)[1]

---

1. This opinion was issued as a classified opinion and order on March 27, 2013. On May 23, 2013, the parties proposed a public version. Adopting the redactions proposed by the parties, the Court issued this opinion under seal on May 24, 2013, and invited the parties to submit any objections by May 29, 2013. No objections having been received, the Court publishes this opinion with the redactions proposed by the parties.

Jonathan D. Shaffer, Smith Pachter McWhorter PLC, 8000 Towers Crescent Drive, Suite 900, Tysons Corner, VA 22182, for Plaintiff. John S. Pachter, Mark E. Hanson, and Mary Pat Buckenmeyer, Smith Pachter McWhorter PLC, of Counsel.

Stuart F. Delery, Jeanne E. Davidson, Kirk Manhardt, and William P. Rayel, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C. 20044. Elizabeth Witwer, Commercial Litigation Branch, United States Department of Justice, and Scott N. Flesch, United States Army Contract and Fiscal Law Division, of Counsel.

**Post-award Bid Protest; Supplementation of the Court Record; Nonresponsibility Determination; Joint Venture; De Facto Debarment; Due Process; National Security.**

### OPINION AND ORDER

WILLIAMS, Judge.

In this post-award bid protest, MG Altus Apache Company ("MG AA") challenges its

nonresponsibility determination and exclusion from the competition in the National Afghan Trucking ("NAT") multiple-award procurement for trucking services in Afghanistan. MG AA alleges that the Department of the Army ("the Army") (1) relied upon a classified "vendor vetting" rating process that illegally applied a *de facto* debarment standard, (2) misapplied the vendor vetting program's procedures, and (3) "blacklisted" the HNT prime contractors, precluding MG AA from receiving an award.

This matter comes before the Court on the parties' cross-motions for judgment on the Administrative Record ("AR") and Plaintiff's request for injunctive relief. Because Plaintiff has failed to demonstrate that MG AA's nonresponsibility determination was arbitrary, capricious, or illegal, the Court grants Defendant's motion for judgment on the AR.

### Findings of Fact [2]

#### The Solicitation

On February 22, 2011, the Army issued solicitation number W91B4N–11–R–5000 for NAT services in Afghanistan. The purpose of the NAT contract was to provide a secure and reliable means of distributing reconstruction material, security equipment, fuel, miscellaneous dry cargo, and life support assets to operating bases and distribution sites throughout the combined joint operations area in Afghanistan. The Army anticipated the award of indefinite delivery/indefinite quantity contracts for trucking services in three suites: Suite 1 for bulk fuel, Suite 2 for dry cargo, and Suite 3 for heavy cargo. AR 390. The NAT procurement was essentially a follow-on procurement to the prior Host Nation Trucking ("HNT") contract, which had covered substantially the same mission requirements. The Army awarded NAT contracts to 20 contractors, none of whom had been HNT prime contractors.[3]

---

**2.** The findings of fact are derived from the Administrative Record. Citations to "AR" are to the unclassified portions of the Administrative Record, and citations to "MGA" or "REF" are to the classified portions.

**3.** One HNT prime contractor, Anham, was subsequently awarded a NAT contract on February 7,

The solicitation stated that the Army would make awards based on "lowest price technically acceptable" proposals in accordance with Federal Acquisition Regulation ("FAR") 15.101–2.[4] Proposals were to be evaluated using two criteria: technical capability and price. AR 391. The solicitation stated that the Government would evaluate offerors for responsibility in accordance with FAR 9.1. AR 393. FAR 9.104–1 provides:

To be determined responsible, a prospective contractor must—

(a) Have adequate financial resources to perform the contract, or the ability to obtain them (see 9.104–3(a));

(b) Be able to comply with the required or proposed delivery or performance schedule, taking into consideration all existing commercial and governmental business commitments;

(c) Have a satisfactory performance record (see 48 CFR 9.104–3(b) and part 42, subpart 42.15) . . . .

(d) Have a satisfactory record of integrity and business ethics (for example, see Subpart 42.15).

(e) Have the necessary organization, experience, accounting and operational controls, and technical skills, or the ability to obtain them (including, as appropriate, such elements as production control procedures, property control systems, quality assurance measures, and safety programs applicable to materials to be produced or services to be performed by the prospective contractor and subcontractors) (see 9.104–3(a));

(f) Have the necessary production, construction, and technical equipment and facilities, or the ability to obtain them (see 9.104–3(a)); and

---

2012, after it was evaluated for responsibility following the settlement of its bid protest.

**4.** All references to the FAR are to Title 48 of the Code of Federal Regulations as codified at the time of MG AA's responsibility determination on August 10, 2011.

(g) Be otherwise qualified and eligible to receive an award under applicable laws and regulations....

FAR 9.104–1(2010).

### Submission of Proposals and MG AA's Responsibility Evaluation

MG AA is a joint venture comprised of MG Services Limited ("MG"), Altus Supply and Services ("Altus"), and Apache Defense, LLC ("Apache"). Compl. ¶ 12. MG is an American-owned and managed firm that operates exclusively within Afghanistan. Compl. ¶¶ 12, 14. MG had previously been in a joint venture with an Afghan company, Ettefaq–Meliat–Hai–Afghan Consulting, Inc. ("EMA"), and the MG EMA joint venture was an HNT prime contractor. Compl. ¶ 2. MG employees [redacted] and [redacted] were project managers for the MG EMA joint venture. As project managers for MG EMA, [redacted] corresponded with the HNT contracting officer regarding MG EMA's performance issues on behalf of the MG EMA joint venture. Specifically, [redacted] responded to a February 1, 2010 letter of concern from the HNT contracting officer, and [redacted] responded to cure notices and letters of concern between December 2009 and August 2011. See AR 16275 ([redacted] response to February 1, 2010 letter of concern), 16284 ([redacted] response to July 5, 2011 cure notice), 21263 ([redacted] response to Dec. 22, 2009 letter of concern), 21265 ([redacted] response to September 1, 2010 letter of concern), 21267 ([redacted] response to July 10, 2011 cure notice rejection), 21272 ([redacted] response to August 9, 2011 letter of concern), 21275 ([redacted] response to August 12, 2011 letter of concern rejection).

MG formed a new entity for the NAT procurement, MG AA, with Altus and Apache. Compl. ¶ 12. Altus is an Afghan–American owned firm specializing in trucking operations, and Apache is an American corporation specializing in Afghanistan-based security services. Compl. ¶¶ 19–21. MG was to provide trucking operations management services for the NAT contract. AR 4092.

MG AA timely submitted its proposal for all three NAT suites. AR 4049–332. As part of its proposal, MG AA included the Joint Venture Agreement creating MG AA, which designated MG as the Lead Member. AR 4066–91. The Agreement provided that the Lead Member is responsible for "[c]ontracts-level Program Management, Contracts Administration and Accounting, and Financial Administration...." AR 4068. In addition, the Lead Member serves as the primary point of contact with customers on contractual matters and provides general program management and contracts finance and accounting functions on behalf of the joint venture, including processing deliverables and timely notifying joint venture members of all client communications regarding joint venture performance issues, problems, and resolutions. Id. The Agreement further stated:

> "Joint Venture Manager" shall be a MG representative ... who shall manage day-to-day operations. In addition to other duties, the Joint Venture Manager shall be the primary point of Contractual contact with clients and responsible for directing resolution of all Contractual matters of the Joint Venture and providing regular oversight of performance on behalf of the Joint Venture.

AR 4068–69.

MG AA's proposal further indicated that "MG provides significant positive and negative financial incentives down to the individual driver level which keep loading and delivery timely, ensure proper ITV utilization, and minimize the possibility of theft." AR 4092. MG also described the capabilities of its "trucking operations management team" and stated that "[o]ver the last four and a half years MG has refined its trucking management processes, strategies and tools to maximize performance for the client and benefit to the company, its subcontractors, employees and owners." AR 4092.

MG AA listed the HNT contract as a reference for itself and for three of its proposed subcontractors. AR 4128–29. In its NAT proposal, MG AA proposed [redacted] MG's Vice President of Corporate Development, who had been an MG EMA program manager for the HNT contract, as MG AA's

program manager for the NAT contract. MG AA attached [redacted] resume and April 6, 2011 letter of committal as MG AA's Program Manager for the NAT contract to its proposal for Suite 2 of the NAT contract. *See* AR 4248–49. [redacted] had served as the program manager for the MG EMA joint venture under the HNT contract from February, 2010 to August, 2010. AR 4248.

On July 29, 2011, the Army eliminated all bidders whose proposals failed either the technical or price requirements, and forwarded the remaining proposals for determinations of responsibility. AR Tabs 94.1–94.3. By letter dated July 30, 2011, the contracting officer informed MG AA that its responsibility evaluation was ongoing and listed several areas of concern relating to MG EMA's performance of the HNT contract. AR 16237–38.[5] The contracting officer issued a corrected version of this letter on July 31, 2011.[6] The contracting officer requested that MG AA provide responses addressing the circumstances giving rise to the area of concern, identifying any mitigating circumstances, and outlining the corrective action taken to prevent reoccurrence. AR 16244–45. Adverse information involved MG EMA's noncompliance with In-transit Visibility ("TTV") contract requirements, failure to meet Private Security Contractor ("PSC") Arming Requirements, forged Transportation Movement Requests ("TMRs"), and withholding of contract payments for failed missions, canceled no-pay missions, pilferage/backcharges, and fuel backcharges. *Id.* In describing this adverse information, the contracting officer cited letters of concern issued to MG EMA dated December 22, 2009, February 1, 2010, and August 31, 2010, and cure notices dated January 1, 2010, and July 5, 2011. *Id.* MG EMA's project manager, [redacted], authored a response to the February 1, 2010 letter of concern. *See* AR 16275.

On August 1, 2011, MG AA responded to the contracting officer's notice of the ongoing responsibility evaluation, detailing the relevant circumstances, mitigating factors, and corrective action with respect to each area of concern. AR 16250–59. [redacted], Chief Executive Officer of MG, signed the response on behalf of MG AA. AR 16259. [redacted] also co-signed MG AA's Joint Venture Agreement on behalf of MG and signed the memorandum included in MG AA's NAT proposal detailing each joint venture member's proposed contribution to the MG AA joint venture. AR 4091–93. [redacted] was also one of two individuals—both MG employees—who were authorized to "legally and contractually obligate MG Altus Apache Company." AR 4094. [redacted], MG Director, was the second MG official authorized to enter into contractual obligations on behalf of MG AA. AR 4094.

On August 10, 2011, contracting officer Salia J. Price found MG AA nonresponsible, relying on the MG EMA joint venture's performance and corrective action under the HNT contract.[7] Specifically, the contracting officer stated: "On 30 July 11, the NAT Contracting Officer sent a consolidated list of adverse information regarding MG Altus's performance of its Host Nation Trucking (HNT) services contract W91B4N–09–D–5002. Contract W91B4N–09–D–5002 was awarded to MG–Ettefaq Miliat Hai Afghan as a joint venture (MG–EMA JV), however, this determination will hereinafter refer to the Contractor as 'MG–Altus.' The HNT contract precedes the NAT requirement that was provided as a contract reference." *Id.*

### MG AA's Inability to Meet the Delivery or Performance Schedule

The contracting officer first determined that MG AA did not meet the requirements of FAR 9.104–1(b), which provides that the prospective contractor must "[b]e able to

---

**5.** EMA was also a NAT offeror and challenged its nonresponsibility determination and exclusion from the NAT procurement in a protest before this Court. *See Ettefaq–Meliat–Hai–Afghan Consulting, Inc. v. United States,* 106 Fed.Cl. 429 (2012).

**6.** The contracting officer changed a reference to transponder stacking in the July 30, 2011 letter,

to "submission of forged Transportation Movement Requests" in the July 31, 2011 letter. AR 16238, 16245.

**7.** MG AA's responsibility evaluation contains classified material. Plaintiff filed an unclassified redacted version of MG AA's responsibility determination. Pl.'s Reply–Response, Attachment 1.

comply with the required or proposed delivery or performance schedule, taking into consideration all existing commercial and governmental business commitments." MGA 3. The contracting officer stated:

> There is evidence that MG ALTUS's repeated failure to comply with the terms and conditions of [the HNT contract] inhibited compliance with the required delivery and performance requirements when performing Host Nation Trucking (HNT) in Afghanistan. Specifically, a Cure Notice issued regarding failure to provide deliverables (including arming requirements), dated 1 Jan 2010 and the Letter of Concern issued for failure to meet Private Security Contractor Arming Requirements, dated 1 Feb 2010. These events demonstrate a systemic trend in failing to comply with significant contract requirements which include critical areas of security and safety which directly impact compliance with required schedule and performance requirements. Contractors under the HNT contract cannot perform individual transportation missions unless compliance with arming and associated training requirements and utilization of authorized PSC firms are demonstrated. MG ALTUS's history of non-compliance with submission of deliverables, inability to properly manage its employees and subcontractors, including the Private Security Contractor, and its failure to implement effective corrective action which prevented reoccurrence do not support a determination that MG ALTUS will be able to comply with the required delivery and performance requirements under the NAT requirement.

MGA 3–4.

### MGAA's Lack of a Satisfactory Performance Record

The contracting officer also found that MG AA did not satisfy the requirements of FAR 9.104–1(c), which requires that a prospective contractor have a satisfactory performance record. The contracting officer found that several areas of concern "indicate[d] a systemic problem with MG Altus adhering to the material provisions of the contract, thus resulting in significant doubt that [it could]

perform the services required without a high degree of risk passed to the U.S. Government." MGA 4.

First, the contracting officer found that on several occasions MG AA failed to comply with the requirements of the HNT contract's Statement of Work (SOW), including failure to provide "correct and complete armed employee authorization packages and registration in the Synchronized Predeployment Operational Tracker (SPOT) database" in accordance with the contract's PSC Arming requirements. MGA 4.

Second, the contracting officer noted that "[m]ultiple failures to comply with the HNT SOW requirements led to millions of dollars being withheld for a combination of failed missions, cancelled-no pay missions, pilferage/back charges and fuel back charges ... throughout the period of performance of its current trucking contract." MGA 4. The contracting officer stated that the canceled missions due to failure to comply with the SOW requirements "exposed Afghan and American Service members to unnecessary risk." MGA 4.

### MG AA's Lack of a Satisfactory Record of Integrity and Business Ethics

Additionally, the contracting officer found that MG AA did not satisfy FAR 9.104–1(d)'s requirement for a satisfactory record of integrity and business ethics. MGA 4–5. The contracting officer cited several incidents, which she found showed "a systemic pattern of fraudulent behavior and activity[.]" MGA 5. First, the contracting officer cited a December 22, 2009 letter of concern and July 5, 2011 cure notice regarding non-compliance with ITV contract requirements. *Id.* The NAT contracting officer noted that MG's response to the HNT contracting officer blamed its joint venture partner, EMA, for its failure to comply with ITV requirements. The NAT contracting officer stated: "Nevertheless, MG Altus (in its capacity as a JV partner with EMA under the HNT) failed to establish proper internal controls to prevent occurrence of such incidents." MGA 5.

Second, the contracting officer found that $23,200,686.62 had been withheld "for a combination of failed missions, Cancelled No Pay

Missions, Pilferage/Backcharges, and Fuel Backcharges under [the HNT contract], of which $6,051,042.62 is specifically attributed to MG Altus' performance failures." MGA 5.

Third, the contracting officer referred to a letter of concern dated August 31, 2010, for "submission of forged Transportation Movement Requests," and further indicated that there were "reported reoccurring instances of submission of forged TMRS under [the HNT] contract," noting that MG AA's implementation of corrective plans did not prevent repeated offenses over the last two years that validated MG AA's inability to successfully manage its employees and subcontractors. MGA 5.

Fourth, the contracting officer noted that MG AA had been referred for proposed debarment based on "numerous alleged acts of criminal misconduct such as forgery and false claims, and violations of Title 18 USC 495 and 287 in performance under [the HNT contract]," further substantiating MG AA's "integrity issues and lack of business ethics." MGA 6.[8]

Fifth, the contracting officer noted that MG AA lacked business ethics and integrity based on a report prepared by a military intelligence unit, the IJC Combined Joint Staff for Counter–Intelligence and Human Intelligence Operations ("CJ2X"). Citing CJ2X's report, the contracting officer found that [redacted] MGA 6. The contracting officer specified:

[redacted] further substantiates MG ALTUS' lack of ethics and integrity.

MGA 6.

Sixth, the contracting officer referenced intelligence reports indicating that an employee of MG EMA attempted to access a military facility with false identification provided by MG EMA. The employee reported that the manager of the MG EMA joint venture had a "standard practice" of providing false identification badges to circumvent base access issues and allow employees to

assist in moving cargo quickly. MGA 6. The contracting officer concluded that "[t]he unethical decision to allow unauthorized access to U.S. identification media increases the force protection risk to U.S. and Coalition forces." MGA 6–7.

### MG AA's Lack of Organization, Experience, Accounting and Operational Controls, and Technical Skills, and Lack of Qualifications and Eligibility under Applicable Laws

The contracting officer also determined that MG AA did not "[h]ave the necessary organization, experience, accounting and operational controls, and technical skills, or the ability to obtain them" as required by FAR 9.104–1(e), citing cure notices in January, 2010, and July, 2011, for failure to improve ITV utilization rates, failure to comply with Defense Base Act ("DBA") insurance coverage requirements, and refusal of missions. MGA 7. The contracting officer concluded that this history of nonperformance indicated "a lack of quality assurance and operational controls." MGA 7. Additionally, the contracting officer cited MG AA's lack of compliance with PSC arming requirements, finding that this noncompliance "does not provide the Government confidence in MG Altus' safety and security programs." *Id.*

Finally, the contracting officer found that MG AA was not qualified or eligible to receive award under applicable laws and regulations as required by FAR 9.104–1(g), because MG AA had been deemed "ineligible for award" based upon a vendor vetting assessment prepared by CJ2X. MGA 7–8. Citing CJ2X's report, the contracting officer stated:

[redacted]

MGA 9–10. CJ2X's report stated:

[redacted]

MGA 74.

The contracting officer also noted that CJ2X found [redacted] MGA 10. However,

---

8. 18 U.S.C. § 495 (2006) prohibits the act of forging a writing for the purpose of obtaining or receiving a sum of money from the United States or its officers or agents.

18 MU.S.C. § 287 (2006) prohibits the act of providing to any officer in the civil or military service of the United States, or to any department or agency, any claim upon the United States knowing that the claim is "false, fictitious, or fraudulent."

the contracting officer stated that this consideration was "insufficient [redacted] and further substantiate[s] MG ALTUS's inability to maintain integrity and business ethics while performing transportation services in [the] Afghanistan area of operation...." MGA 10. The contracting officer concluded that MG AA posed a "force protection threat" to United States and Coalition operations and was nonresponsible under FAR 9.104–1(g). MGA 13.

### MG AA's Debriefing

By letter dated August 10, 2011, the Army informed MG AA that it had been eliminated from the competition because it was nonresponsible. AR 16326–27. On the same day, MG AA requested via email and received a written debriefing indicating that MG AA's proposals for each suite were technically acceptable, and MG AA's prices were fair, reasonable, and balanced, but that MG AA was deemed nonresponsible and eliminated from the competition. AR 16328, 16338–39.

### The Vendor Vetting Program in Afghanistan

Prior to award of the NAT contract, the military implemented a classified "vendor vetting" program designed to ensure the reliability of government contractors in Afghanistan. As a result of this process, MG AA was determined to be a [redacted] and ineligible for award, but due to the classified nature of the report, MG AA was not advised either of the CJ2X report or of its [redacted] rating and ineligibility. MGA 6.

On November 5, 2010, the CENTCOM Contracting Command issued an "Acquisition Instruction" governing acquisitions supporting operations in Afghanistan. REF 11.[9] The Acquisition Instruction requires contracting officers to vet all non-U.S. vendors operating in Afghanistan as directed by Fragmented Order ("FRAGO") 10–330. REF 74. FRAGO 10–330 mandated the creation of a program to "vet prospective non-US vendors to prevent insurgents, terrorists, criminals, and militias from using contract proceeds to fund their operations" [redacted] REF 218. FRAGO 606–2010, issued by the

International Security Assistance Force Joint Command ("IJC"), also details procedures for the vendor vetting process. REF 236–39.

The vetting process is outlined both in the Acquisition Instruction and, primarily, in FRAGO 10–330. The process has several steps. First, a non-U.S. vendor registers with the Joint Contingency Contracting System ("JCCS") by submitting data regarding the vendor's location and identification. REF 74, 230. Second, the contracting officer submits all non-U.S. vendors for vetting by JCCS, a process which takes approximately 14 days. REF 75, 231.

A military intelligence unit, CJ2X, assesses vendors by "risk to mission," and classifies that risk as either " 'MODERATE," "SIGNIFICANT," "HIGH," or "EXTREMELY HIGH.' " REF 231. A rating of "MODERATE" means that [redacted] REF 224. A rating of "SIGNIFICANT" means that [redacted] *Id.* A rating of "HIGH" means that [redacted] *Id.* A rating of "EXTREMELY HIGH" means that [redacted] *Id.* The classification of a vendor as "HIGH" or "EXTREMELY HIGH" risk requires a "Validation Panel" to determine whether the vendor should be "approved" or "rejected" within three days "by considering the intelligence assessment and other relevant information." REF 231. A "rejected" vendor is ineligible to receive contract awards in Afghanistan. REF 231–33.

The FRAGO delineating the vendor vetting process contains the following sections:

> **Vetting and Contractor Assessment:** ...
> If the vendor is deemed "rejected" then the ISAF CJ2X will provide the intelligence assessment to the requiring activity and inform them of the decision and procedures to request an Exception to Policy (ETP), also referred to as waiver).
>
> ...
>
> **Exception to Policy** (ETP) Waivers: If after reading the intelligence assessment report and consulting with their local contracting officer, the [Battle Space Owner] or requesting activity determines that an

---

9. CENTCOM is a "Unified Combatant Command, directly under the Secretary of Defense, that assists nations, primarily in the Middle East, to combat terrorism, establish secure environments, and foster regional stability." Def.'s Cross–Mot. for J. on the Admin. R. 1 n.1.

ETP is required, they must complete a "Rejected Contractor Waiver."

REF 231–32. As this passage indicates, a CJ2X report concluding that a bidder is "rejected" does not necessarily mean that a contractor is ineligible for award at the time of rejection. Even if the "rejected" status is confirmed by the Validation Panel, the requiring unit may seek an exception. The waiver must explain the urgent nature of the contract, the market research performed by the contracting agency, the risk to the mission if the waiver is not approved, and a proposal to mitigate risks to U.S. Forces should the waiver be granted. REF 76, 232. The waiver process must be completed within 30 days unless an extension is granted. REF 233. If a waiver is not approved by the appropriate Deputy Commander for United States Forces in Afghanistan ("USFOR–A"), a contracting officer may not award contracts to the rejected vendor. REF 76, 233.

Under both the FRAGO and the Acquisition Instruction, notification of rejection is required only if the vendor would otherwise be the "apparent successful offeror," and the vendor requests a debriefing. REF 75–76. Even if an apparent successful offeror requests and receives a debriefing, the contracting officer may only inform it of the following, in writing:

> You were determined to be ineligible for award of subject contract by United States Forces—Afghanistan/Iraq. You may submit a written request for reconsideration of this determination to USFOR–A/USF–I, through the Contracting Officer, within 60 calendar days of this notification.

REF 76. The FRAGO mandates that rejected vendors "shall only be notified of their rejected status if there is a legal necessity to do so." REF 233. The Acquisition Instruction states that "[i]f an offeror is not the apparent successful offeror, follow normal procedures. **DO NOT MENTION THEIR INELIGIBILITY[.]**" REF 76. Once vetted, contractors will be re-vetted every 180 days "if possible." REF 235. If CJ2X does not re-vet a contractor, the original vetting remains effective for one year. *Id.*

### MG AA's Vendor Vetting

On July 25, 2011, CJ2X determined [redacted]

[redacted]

MGA 75.

CJ2X's assessment cited reports [redacted] MGA 74. CJ2X further noted that [redacted] MGA 74.

On July 25, 2011, CJ2X issued its [redacted] vendor vetting rating for MG AA. MGA 74–76. In accordance with the vendor vetting process, the NAT contracting officer requested confirmation from the requiring activity as to whether it would seek a waiver. On August 3, 2011, the requiring activity declined to pursue a waiver. MGA 11. Because CJ2X [redacted] and the requiring activity did not seek a waiver, MG AA was determined to be a "rejected" contractor for United States procurements in Afghanistan. MGA 7–8. MG AA's nonresponsibility determination stated: "A review of MG ALTUS's status in the [Joint Contingency Contracting System] identifies MG ALTUS as 'CJ2X Rejected' as of 25 July 2011 and therefore ineligible for award." MGA 8. The contracting officer listed MG AA's " 'CJ2X Rejected' " status and concomitant ineligibility as a basis for her final determination of nonresponsibility issued on August 10, 2011. MGA 13.

### Discussion

### Jurisdiction and Standard of Review

■ The Court has jurisdiction over this bid protest pursuant to the Tucker Act, 28 U.S.C. § 1491(b)(1) (2006). In a bid protest, the Court reviews an agency's procurement decision under the standards enunciated in the Administrative Procedure Act ("APA"), 5 U.S.C. § 706 (2006). 28 U.S.C. § 1491(b)(4) (2006); *see Ala. Aircraft Indus., Inc.–Birmingham v. United States*, 586 F.3d 1372, 1373 (Fed.Cir.2009). Pursuant to the APA, this Court may set aside an agency action that was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *Ala. Aircraft Indus.*, 586 F.3d at 1373.

■ An agency action is arbitrary and capricious when the agency " 'entirely failed to consider an important aspect of the prob-

lem, offered an explanation for its decision that runs counter to the evidence before the agency, or [the decision] is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" *Ceres Envtl. Servs., Inc. v. United States,* 97 Fed.Cl. 277, 302 (2011) (quoting *Ala. Aircraft Indus.,* 586 F.3d at 1375). An "agency must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983) (quoting *Burlington Truck Lines. Inc. v. United States,* 371 U.S. 156, 168, 83 S.Ct. 239, 9 L.Ed.2d 207 (1962)).

■ "Contracting officers are afforded considerable discretion in negotiated procurements, such as this one, where award is premised on a 'best value' determination." *Ceres Envtl. Servs., Inc.,* 97 Fed.Cl. at 302 (citing *Banknote Corp. of Am., Inc. v. United States,* 365 F.3d 1345, 1355 (Fed.Cir. 2004)). Importantly, "[c]ontracting officers are 'generally given wide discretion' in making responsibility determinations and in determining the amount of information that is required to make a responsibility determination." *Impresa Construzioni Geom. Domenico Garufi v. United States,* 238 F.3d 1324, 1334–35 (Fed.Cir.2001) (quoting *John C. Grimberg Co. v. United States,* 185 F.3d 1297, 1303 (Fed.Cir.1999)); *see also News Printing Co. v. United States,* 46 Fed.Cl. 740, 746 (2000) ("'A contracting agency has broad discretion in making responsibility determinations since it must bear the brunt of difficulties experienced in obtaining the required performance.'") (quoting *House of Commc'ns & Graphics,* B–245920, 1992 WL 55054, at *2 (Comp. Gen. Mar. 4, 1992)). "When such decisions have a rational basis and are supported by the record, they will be upheld." *Bender Shipbuilding & Repair Co. v. United States,* 297 F.3d 1358, 1362 (Fed.Cir.2002). Plaintiff has the burden of establishing that the responsibility determi-

nation was arbitrary and capricious. *Impresa,* 238 F.3d at 1337.

■ In resolving bid protests, the trial court is to make findings of fact weighing the evidence in the administrative record. *See Bannum, Inc. v. United States,* 404 F.3d 1346, 1355 (Fed.Cir.2005). If the protestor succeeds in demonstrating an error in the procurement process, the Court then proceeds to determine, as a factual matter, whether the protestor was prejudiced by that error.

### Plaintiff's Motion to Supplement the Court Record [10]

■ Plaintiff seeks to supplement the Court's record with the decision of the Army's Suspension and Debarment Official ("SDO") terminating the referral for proposed debarment of Guzar Mirbachakot Transportation ("GMT"), another HNT contractor. GMT was referred for proposed debarment based on allegations that GMT forged TMRs and submitted false claims during performance of the HNT contract. On January 31, 2012, the SDO terminated the proposed debarment of GMT, stating:

> *Army records and statements are insufficient to prove fraud.* The statements provided by the receiving unit representatives contain numerous inconsistencies and contradictions; and thus, lack sufficient reliability and credibility. First, the statements, individually or in combination, fail to support a finding that GMT more likely than not committed fraud. These statements merely indicate that there is no unit record available to verify certain GMT TMRs. Hence, they fail to eliminate other plausible causes for the lack of unit records, including misplaced or lost records, or fuel missions re-directed to other locations.... Second, the statements are inconsistent and contradicted by other evidence....

Pl.'s Mot. to Supplement the Court R. Ex. 1 at 8–9.[11] The SDO detailed statements by

---

10. The Court previously granted Plaintiffs motion to supplement the AR with correspondence relating to MG EMA's HNT performance.

11. Attachment 1 to Plaintiff's motion to supplement the Court's record includes separately paginated documents. The Court adopts the pag-

Army representatives that were either inconsistent with or contradicted by TMRs produced by GMT indicating that Army personnel had actually signed the TMR in question. *Id.* at 9–10. The SDO further concluded "[i]n the present case, there is a lack of direct or circumstantial evidence showing that ... GMT, its owner, or its employees falsified any TMRs with the intent to defraud the U.S. government." *Id.* at 10.

Plaintiff claims that the SDO's decision should be added to the Court's record because the SDO's findings confirm a pattern of Army attempts to blacklist or otherwise exclude HNT prime contractors, and indicate the absence of any motive of HNT contractors to submit forged mission sheets, as well as the inconsistency and unreliability of Army records. Plaintiff's argument fails because the SDO's termination of GMT's referral for proposed debarment is immaterial to this protest. Debarment proceedings are individualized assessments, tailored to the unique circumstances of each contractor. GMT was referred for proposed debarment based on allegedly forged TMRs submitted to the Army to obtain payment for fuel deliveries that GMT never completed. To rebut the allegations in the referral, GMT submitted documentation to the SDO, including actual TMRs and ITV records. Based on this particularized evidence, the SDO determined that there was insufficient evidence of fraud to warrant GMT's debarment. The SDO also concluded that in certain cases, there was no record to verify GMT's TMRs because the Army had misplaced or lost records or re-directed fuel missions to other locations. The SDO's findings in GMT's case based on GMT's evidence and some lost rec-

ords are not probative of allegations that a different contractor, MG EMA, forged TMRs. In any event, in its response to the NAT contracting officer's notification of the ongoing responsibility evaluation, MG AA acknowledged that MG EMA's drivers forged TMRs during HNT performance. *See* AR 16255 (describing forgeries by drivers), 16258 (estimating "approximately 20 mission sheets forged during the 2+ year span of this contract).[12] As such, the Court denies MG AA's motion to supplement the court record with the Army SDO's decision terminating GMT's proposed debarment.

### *The Parties' Motions for Judgment on the Administrative Record*

### *The Army's Responsibility Determination Was Reasonable*

MG AA alleges that the contracting officer's nonresponsibility determination was unreasonable in several respects. At the outset, MG AA contends that the contracting officer improperly considered MG EMA's HNT performance in evaluating MG AA's responsibility for the NAT procurement. MG AA also claims that the contracting officer's reliance on MG AA's vendor vetting assessment was unreasonable because CJ2X's reporting was outdated, the vendor vetting program resulted in MG AA's *de facto* debarment without affording it due process, and the Army failed to notify MG AA of its vendor vetting rejected status, as required by the vendor vetting regulations. MG AA further claims that MG AA's performance concerns were insufficient to deem MG AA nonresponsible. Finally, MG AA alleges that its nonresponsibility determination was a pretext for "blacklisting" the HNT

ination generated by the CM/ECF filing system for citation purposes.

**12.** The record does not indicate whether the TMRs MG AA acknowledged were forged were the same TMRs cited in MG EMA's referral. The Criminal Investigation Division report attached to MG EMA's referral for proposed debarment did not identify the five TMRs MG EMA allegedly forged, other than to indicate that they were submitted to the 313th Movement Control Battalion in Afghanistan and "originated at various military bases throughout Afghanistan." MGA 52. In MG AA's response to the contracting officer's notification of the ongoing responsibility evalua-

tion, MG AA referred to an August 31, 2010 letter of concern in which the Army specifically identified three allegedly forged TMRs submitted to the 419th Joint Movement Control Battalion. AR 16277. MG AA stated that its drivers "white[d] out" details on mission sheets to avoid being charged for missing fuel. AR 16255. In the same response, MG AA also addressed the NAT contracting officer's reference to "reoccurring instances of submission of forged Transportation Movement Requests" under the HNT contract. MG AA acknowledged that MG EMA forged other TMRs, but did not specify the TMRs in question. AR 16258.

contractors. Although the Court addresses Plaintiff's contentions in turn, at the outset the Court notes that, on the whole, the evidence on which the contracting officer relied to find MG AA nonresponsible was sufficient to support a conclusion that the contracting officer's judgment call was reasonable. Under the FAR, when evaluating a prospective contractor for responsibility, a contracting officer "*shall* make a determination of nonresponsibility" if there is an "absence of information clearly indicating that the prospective contractor is responsible.…" FAR 9.103(b) (2010) (emphasis added). Given the problems with MG EMA's past performance on the HNT contract and the significant role of MG in both the management of MG EMA's HNT performance and in the proposed performance of the NAT contract, the record does not support a conclusion that MG AA provided "information clearly indicating" that MG AA was responsible.

### The Contracting Officer Reasonably Relied on MG EMA's HNT Contract Performance in Evaluating MG AA's Responsibility for the NAT Procurement

 MG AA asserts that the contracting officer improperly considered MG EMA's HNT performance in MG AA's responsibility determination given MG's formation of a new joint venture with Altus and Apache for the NAT procurement. MG AA disclaims responsibility for MG EMA's HNT performance, stating that "[a]ll of the negative issues identified in third party reports were solely EMA issues according to the terms of the MG EMA Joint Venture agreement and the actual activities of the two parties during performance of the HNT contract." Pl.'s Mot. for J. on the Admin. R. 15. Although Plaintiff expressly references MG EMA's HNT joint venture agreement to attempt to distance itself from EMA, this agreement is not in the record. Tr. 19, 46.[13] Similarly, although Plaintiff distinguishes between the activities of MG and EMA during HNT performance, MG EMA's proposal for the HNT contract is not in the record. Plaintiff's attempt to attribute "all negative issues" in HNT performance to EMA is not supported

by the record. Tr. 47. Rather, what evidence there is about the responsibilities of these co-venturers reflects that MG had a significant role in both MG EMA's performance on the HNT contract and MG AA's proposed performance for the follow-on NAT contract. The record evidence that reflects MG's responsibilities in the MG EMA joint venture demonstrates that MG had a managerial role in HNT performance. MG EMA's correspondence with the HNT contracting officer indicates that MG employees [redacted] and [redacted] were project managers for the MG EMA joint venture and had the authority to present MG EMA's position to the contracting officer on the joint venture's performance issues. As a project manager for MG EMA, [redacted], MG's Vice President of Corporate Development, issued a response to a February 1, 2010 letter of concern from the HNT contracting officer. *See* AR 16275. [redacted], also an MG employee and a project manager for the MG EMA joint venture, responded to cure notices and letters of concern on behalf of the MG EMA joint venture. AR 16284, 21263, 21265, 21267, 21272, 21275.

MG AA also touted the abilities of MG's "trucking operations management team" in its proposal, citing its experience under the HNT contract. MG AA stated: "[o]ver the last four and a half years MG has refined its trucking management processes, strategies and tools to maximize performance for the client and benefit to the company, its subcontractors, employees and owners." AR 4092. Moreover, in its response to the contracting officer's notification of the ongoing responsibility evaluation, MG AA referenced MG's managerial experience in blaming EMA for performance problems, stating "EMA has consistently and blatantly violated our joint venture agreement in ways that have limited our effectiveness in properly *managing* this contract.…" AR 16258 (emphasis added).

MG AA's NAT proposal further indicated that MG was to have a significant role in the MG AA joint venture. MG AA proposed

---

**13.** Although Plaintiff moved to supplement the AR with correspondence relating to MG EMA's HNT performance, it did not seek to add MG

EMA's joint venture agreement or MG EMA's HNT proposal.

MG's Vice President of Corporate Development, [redacted], who had been MG EMA's program manager for the HNT contract from February 2010 to August 2010, as MG AA's program manager for the NAT contract. *See* AR 4248–49. According to MG AA's joint venture agreement, which was included in its NAT proposal, MG was the "Joint Venture Lead Venturer" or "Joint Venture Lead" or "Lead" or "Lead Member." AR 4068. In this role, MG was responsible for "[c]ontracts-level Program Management, Contracts Administration and Accounting, and Financial Administration," including serving as the primary point of contact with the Army on contractual matters, providing general program management, finance, and accounting functions on behalf of the joint venture, processing deliverables, and timely notifying the members of the MG AA joint venture of all client communications regarding performance issues, problems, and resolutions. AR 4068. In short, MG had a key managerial, financial, and customer-interface role with the Army on behalf of MG AA.

In addition, MG AA relied heavily in its NAT proposal on MG EMA's performance of the HNT contract, even referring to itself as the HNT contractor. *See* AR 4134 ("As both a BPA and HNT contractor, we set up efficient systems and used our experience to adapt to the challenges and changes in Afghan line haul movement services."); 4138 ("On HNT we have consistently been one of the top performing fuel carriers since 2009."); 4201 ("On HNT alone we've done approximately 20,000 missions in the 23 months; …"). Similarly, MG AA listed the entire MG EMA joint venture as a reference in its proposal. AR 4128. In light of MG AA's own reliance in its NAT proposal on MG EMA's experience performing the HNT contract, it was fair game for the contracting officer to consider that experience in MG AA's responsibility determination.

 The pragmatic concern of whether MG AA had the ability to perform the NAT contract also supported the contracting officer's consideration of MG EMA's past performance in assessing MG AA's re-

sponsibility. As the Comptroller General has recognized, in evaluating past performance, "[t]he key consideration is whether the experience evaluated reasonably can be considered predictive of the offeror's performance under the contemplated contract." *Al Hamra Kuwait Co.*, B–288970, 2001 WL 1667818, at *3 (Comp. Gen. Dec. 26, 2001). MG was one of only two members of the MG EMA joint venture that performed the HNT contract, and one of three entities that offered to perform the NAT contract as the MG AA joint venture. The NAT procurement covered substantially the same mission requirements as the HNT contract, and MG had played a managerial role under the HNT contract and was offering to play a managerial role in the NAT procurement. As such, the contracting officer reasonably looked to MG EMA's past performance on the HNT contract in assessing MG AA's potential performance on the NAT contract as part of her responsibility determination.

Plaintiff claims, however, that EMA was solely responsible [redacted] MGA 74.[14] [redacted] MGA 75 (emphasis added).

CJ2X's attribution of EMA's conduct to the MG EMA joint venture is consistent with general legal principles establishing that members of a joint venture have the authority to bind each other in the absence of an agreement to the contrary. As the Federal Circuit has recognized:

> A joint venture is "generally an association of persons by way of contract to engage in and carry out a single business adventure for joint profit, combining their efforts, property, money, skill and knowledge without creating a partnership or a corporation." *Lentz v. United States*, 346 F.2d 570, 575, 171 Ct.Cl. 537 (1965). It has been aptly described as a partnership created for a limited purpose; a joint venture entails legal consequences similar to those of a partnership. *Pine Products Corp. v. United States*, 945 F.2d 1555, 1560 (Fed. Cir.1991); *Gramercy Equities Corp. v. Dumont*, 72 N.Y.2d 560, 534 N.Y.S.2d 908, 531 N.E.2d 629 (1988).

14. CJ2X's report for MG AA [redacted] MGA 88.

The general rule is that each member of a joint venture has the authority to act for and bind the enterprise, absent agreement to the contrary:

In general, a joint adventure ... has many of the elements of the traditional partnership in that either of the venturers may bind the enterprise by contracts which are within the scope of the business enterprise, and within that scope any one of the parties is authorized to act for the others.

*Lentz*, 346 F.2d at 575.

*Sadelmi Joint Venture v. Dalton*, 5 F.3d 510, 513 (Fed.Cir.1993); 12 SAMUEL WILLISTON & RICHARD A. LORD, A TREATISE ON THE LAW OF CONTRACTS § 35.75 (4th ed. 2012) ("Thus, just as one partner can bind fellow partners in transactions made in course of the enterprise, one joint venturer can, absent agreement to the contrary, bind the other joint venturers in transactions which are within the scope of the venture."). Here, Plaintiff has not suggested that the MG EMA joint venture agreement prohibited MG and EMA from acting on behalf of each other. The record does not suggest that EMA's authority to act on behalf of the joint venture was limited. Under the general rule, each member of the MG EMA joint venture had the authority to act for and bind the enterprise. Thus, CJ2X's attribution of EMA's conduct to the MG EMA joint venture was, on this record, consistent with law. So too, the contracting officer's reliance on CJ2X's conclusion was reasonable.

■ Plaintiff further alleges that the contracting officer's consideration of MG EMA's HNT performance was arbitrary and capricious because MG EMA and MG AA are not affiliated concerns under the FAR. Section 9.104–3(c) of the FAR provides that a contracting officer shall consider "the affiliate's past performance and integrity when they may adversely affect the prospective contractor's responsibility." FAR 9.104–3(c) (2010). Defendant proposes that MG EMA and MG AA were affiliates because they shared a common lead member and manager, MG, and, at the time of MG AA's responsibility determination, MG EMA was still intact because the HNT contract had not been completed. This record, however, does not support a finding that MG EMA and MG AA were affiliates under the FAR.

FAR 19.101 states that "[b]usiness concerns are affiliates of each other if, directly or indirectly, either one controls or has the power to control the other, or another concern controls or has the power to control both." FAR 19.101 (2010). The record does not indicate whether as a matter of fact MG EMA and MG AA had the power to control each other, either directly or indirectly, or that a third party could control both. Again, the record is not as robust as it might be, given that neither the MG EMA joint venture agreement, nor MG EMA's HNT proposal, are before the Court. Nor is there any testimony in the record about either joint venture partner's ability to control the other.

■ Had the record supported a finding that MG EMA and MG AA were affiliates, the FAR would have required the contracting officer to have considered MG EMA's past performance and integrity if they might have adversely affected the prospective contractor's responsibility. FAR 9.104–3(c) (2010). As it stands, however, the FAR neither required nor prohibited the contracting officer from considering MG EMA's performance in assessing MG AA's responsibility. As such, this Court's review must be focused on whether the contracting officer's consideration of MG EMA's HNT performance in assessing MG AA's responsibility for the NAT procurement was reasonable. *See Impresa*, 238 F.3d at 1334–35 ("Contracting officers are 'generally given wide discretion' in making responsibility determinations ....") (quoting *John C. Grimberg Co.*, 185 F.3d at 1303). As explained above, multiple factors point to the reasonableness of the contracting officer's consideration of MG EMA's HNT performance in MG AA's NAT responsibility determination. In particular, it was reasonable for the contracting officer to consider MG EMA's performance on the HNT contract because MG EMA and MG AA shared a common joint venture member with managerial responsibilities, MG, and because MG EMA's performance, cited as a reference in MG AA's NAT proposal, reason-

ably predicted MG AA's ability to perform the NAT contract. As the Comptroller General has recognized, the adverse past performance of a prior joint venture may be attributed to a member of the joint venture in a nonresponsibility determination. *See M. Erdal Kamisli Co. Ltd. (ERKA Co., Ltd.)*, B–403909.2, 2011 WL 786037, at *5 (Comp. Gen. Feb. 14, 2011) ("We also disagree with ERKA that the agency could not consider the protestor's performance as a joint venture partner of the Eagle Family Housing contract.").

### *The Contracting Officer Reasonably Relied Upon MG AA's Vendor Vetting Rating*

■ MG AA contends that the contracting officer's reliance on its [redacted] vendor vetting rating—which rendered MG AA ineligible for award—was irrational because CJ2X's conclusions were outdated. In MG AA's nonresponsibility evaluation, the contracting officer cited CJ2X's finding that [redacted] MGA 9–10. The contracting officer specified:

> [redacted] further substantiates MG ALTUS's inability to maintain integrity and business ethics while performing transportation services in the Afghanistan area of operation, historically an area rife with bribery, corruption, and criminal activity.

MGA 10.

MG AA has failed to demonstrate that the contracting officer's reliance on CJ2X's vendor vetting assessment was irrational. As an initial matter, the contracting officer not only was entitled to rely upon CJ2X's report and rating in her nonresponsibility evaluation, she was required to do so. *See* REF 75–76, 233. The FRAGO requires that contracting officers consult CJ2X's vendor vetting assessment, stating: "When a 'rejected' vendor has submitted a proposal and under the evaluation criteria a rejected vendor would be the apparent awardee of the contract, the contracting officer must skip the rejected vendor and award the contract to the next responsible and vetted vendor." REF 233. [redacted] REF 224. A [redacted] is not a matter to be taken lightly. The classification of a vendor as "HIGH" or "EXTREMELY HIGH" risk requires a "Validation Panel" to determine whether the vendor should be "approved" or "rejected" within three days "by considering the intelligence assessment and other relevant information." REF 231. Here, the agency's intelligence assessment for MG AA was based on a three-tiered process—the initial CJ2X intelligence assessment, the Validation Panel's consideration and confirmation of that intelligence assessment, and the agency's refusal to waive the "rejected" contractor's ineligibility.

■ As the Comptroller General has recognized, information in investigative reports may be used as the basis of a nonresponsibility determination. *See Frank Cain & Sons, Inc.*, B–236893, 1990 WL 277550, at *2 (Comp. Gen. Jan. 11, 1990) (noting that a contracting officer was not required to conduct an independent investigation of a criminal investigative report before using it in a nonresponsibility determination); *cf. Guardian Moving & Storage Co. v. United States*, 31 Fed.Cl. 645, 648–49 (1994) (upholding contracting officer's reliance on assurances from the Interstate Commerce Commission regarding a licensing issue). Nonetheless, MG AA seeks to overturn its nonresponsibility determination on the grounds that CJ2X's conclusions were inaccurate and based on outdated military intelligence. Specifically, MG AA contends that CJ2X's report only refers to [redacted] MGA 74.

Contrary to Plaintiff's assertions, it was not arbitrary and capricious for the contracting officer to rely upon a military intelligence report that was almost two years old in her responsibility determination. *See MCI Constructors, Inc.*, B–240655, 1990 WL 293560, at *2–3 (Comp. Gen. Nov. 27, 1990) (affirming contracting officer's reliance in nonresponsibility determination upon company's termination for default two years previously, especially where the contracting officer also considered more recent performance); *Reel–O–Matic Sys., Inc. v. United States*, 16 Cl.Ct. 93, 96 (1989) (upholding Small Business Administration's refusal to issue certificate of competency after considering adverse past performance on prior contract occurring roughly five years prior to the decision, among other factors); *cf. CRAssociates, Inc. v. United States*, 95 Fed.Cl. 357, 386–87

(2010) (noting that Government could not relieve bidder of solicitation's requirement of providing past performance data going back three years).

In any event, MG AA has failed to show that the intelligence assessment on which the contracting officer relied was inaccurate. Indeed, MG AA has not attempted to refute CJ2X's assessment in several instances. The CJ2X assessment noted that MG was previously assessed [redacted] MGA 74. MG AA has not attempted to refute the contracting officer's determination that "[n]o evidence was identified that indicates MG ALTUS, [redacted] MG ALTUS' decision [redacted] further substantiates MG ALTUS' lack of ethics and integrity." MGA 6. Additionally, MG AA has not [redacted] Finally, MG AA has not disputed that during MG EMA's HNT performance, [redacted] MGA 74.

### The Vendor Vetting Procedure Did Not Deprive MG AA of Due Process

Plaintiff further contends that the contracting officer improperly relied on MG AA's vendor vetting rating because that rating resulted from an illegal process. MG AA alleges that the vendor vetting program does not comport with due process because a "rejected" contractor like MG AA, is prohibited from receiving any contract awards without notice of, or an opportunity to respond to, its "rejected" status. In a similar vein, Plaintiff contends that the vendor vetting process fails to provide the procedural safeguards in FAR subpart 9.4 governing the debarment, suspension, and ineligibility of contractors. Specifically, MG AA claims that the vendor vetting program resulted in its de facto debarment because it rendered MG AA ineligible not only for the NAT procurement but for all Department of Defense ("DoD") contracts in Afghanistan, where MG has worked exclusively since it was founded in 2004. Compl. ¶ 12.

 These allegations raise an issue about the extent of this Court's authority to entertain and remedy Plaintiff's claim of de facto debarment. Under 28 U.S.C. § 1491(b)(1), this Court has jurisdiction to "render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement." 28 U.S.C. § 1491(b)(1) (2006). In *Distributed Solutions, Inc. v. United States,* the Federal Circuit broadly defined the phrase "in connection with a procurement or proposed procurement," stating that it "involves a connection with any stage of the federal contracting acquisition process. . . ." 539 F.3d 1340, 1346 (Fed.Cir.2008). Where a claim of de facto debarment is raised as a ground of protest (and not as an isolated claim to nullify the debarment), this Court may consider allegations of de facto debarment in exercising its bid protest jurisdiction. *See TLT Const. Corp. v. United States,* 50 Fed.Cl. 212, 215–16 (2001) (exercising jurisdiction over plaintiff's claim in post-award bid protest that failure to pursue discussions with plaintiff concerning its past performance constituted de facto debarment); *CRC Marine Servs., Inc. v. United States,* 41 Fed.Cl. 66, 68, 84 (1998).

 Here, because MG AA's vendor vetting rating was a basis for MG AA's responsibility evaluation in the challenged NAT procurement, a constitutional challenge to that vetting process predicated on a denial of due process is fair game. This is analogous to the Court's review of a corrective action an agency takes pursuant to a Government Accountability Office ("GAO") recommendation following a successful GAO protest. While this Court lacks jurisdiction to review a GAO decision outright, it may assess whether the GAO decision was rational in order to determine whether the procurement action being challenged—the agency's corrective action predicated on that GAO decision—was reasonable. *See Honeywell, Inc. v. United States,* 870 F.2d 644, 647–48 (Fed. Cir.1989) (stating that in deciding whether an agency justifiably followed GAO's recommendation, the controlling inquiry is whether GAO's decision was rational and cautioning against de novo review of the basis for GAO's determination); *Centech Grp., Inc. v. United States,* 78 Fed.Cl. 496, 507 (2007) (determining that "to the extent that the agency relied upon GAO's decision as a basis for taking

corrective action, GAO's decision is pivotal for the Court's review of the agency's procurement decision."); *Advance Constr. Servs., Inc. v. United States*, 51 Fed.Cl. 362, 365 (2002) (reaffirming "the well-settled principle that 'it is the agency's decision, not the decision of the GAO, that is the subject of judicial review' when a bid protestor protests an award previously reviewed by the GAO.") (quoting *Chas. H. Tompkins Co. v. United States*, 43 Fed.Cl. 716, 719 (1999)). Here too, while CJ2X's determinations would not generally be reviewable in this forum, this Court may consider CJ2X's vendor vetting rating process to the extent the resultant vendor vetting rating was a basis for the contracting officer's nonresponsibility determination.[15]

Plaintiff argues that the contracting officer acted arbitrarily and capriciously in relying on CJ2X's vendor vetting assessment because CJ2X's vendor vetting rating constituted a *de facto* debarment and deprived MG AA of due process. Specifically, MG AA complains that "MG AA has had no opportunity to provide rebuttal evidence, legal argument or factors in mitigation." Pl.'s Classified Annex to Mot. for J. on the Admin. R. 9.

■ A disappointed bidder alleging *de facto* debarment must show evidence demonstrating that the agency will not award the contractor future contracts. *See TLT Const. Corp.*, 50 Fed.Cl. at 215–16 (recognizing that Plaintiff must demonstrate a " 'systematic effort by the procuring agency to reject all of the bidder's contract bids' ") (quoting *Stapp Towing, Inc. v. United States*, 34 Fed.Cl. 300, 312 (1995)). In the seminal case of *Old Dominion Dairy Products. Inc. v. Secretary of Defense*, the D.C. Circuit found that where the agency denied a contractor two substantial contracts based on the determination that plaintiff lacked integrity and "effectively put [plaintiff] out of business," the contractor was entitled to notice of the charges so as to afford the contractor the opportunity to respond. 631 F.2d 953, 963–68 (D.C.Cir.1980); *see Leslie & Elliott Co. v. Garrett*, 732 F.Supp. 191, 198 (D.D.C.1990).

■ Because MG AA's ineligible rating resulting from the Army's vendor vetting process effectively deprived MG AA of future DoD contract awards in Afghanistan for up to one year, its vendor vetting rating operates as a *de facto* debarment. Where, as here, the Government effectively bars a contractor from receiving contract awards and threatens the contractor's livelihood, the Government infringes upon the contractor's constitutionally protected liberty interest. *See Old Dominion*, 631 F.2d at 966–67 (holding that the Government's denial of contract awards that resulted in foreclosure of government employment opportunities for a contractor implicates a liberty interest recognized by the Fifth Amendment); *see also Trifax Corp. v. District of Columbia.* 314 F.3d 641, 644 (D.C.Cir.2003) (stating that Government stigmatization that broadly precludes individuals or corporations from a chosen trade or business deprives them of a constitutionally protected liberty interest). In these circumstances, the deprivation of a contractor's protected liberty interest triggers procedural due process rights under the Fifth Amendment. *Old Dominion*, 631 F.2d at 966.

■ Due process normally requires that a contractor receive notice of the charges impugning its integrity and an opportunity to be heard. *See Old Dominion*, 631 F.2d at 968; *Leslie & Elliott Co.*, 732 F.Supp. at 198. However, the requirements of due process vary given the circumstances. *See Morrissey v. Brewer*, 408 U.S. 471, 481, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972) ("[D]ue process is flexible and calls for such procedural protections as the particular situation demands."). Although the vendor vetting rating process does not provide a contractor either notice of its ineligible status or an opportunity to present rebuttal evidence, requiring traditional due process in the CJ2X rating process would adversely affect national security. In the environment of a warzone when the required notice would necessarily disclose classified material and could compromise national security, normal due process requirements must give way to national secu-

---

**15.** Similarly, Plaintiff has standing to challenge its CJ2X vendor vetting rating insofar as that rating was a basis for its nonresponsibility determination in this procurement.

rity concerns. Not only would affording due process here require disclosure of classified information and endanger military intelligence sources, it would provide information to entities that pose a potential threat to the United States, thereby placing United States forces and operations at risk.

■ The Tucker Act's jurisdictional grant specifically instructs this Court to give due consideration to national security interests in exercising its bid protest jurisdiction. *See* 28 U.S.C. § 1491(b)(3) (2006) ("In exercising jurisdiction under this subsection, the courts shall give due regard to the interests of national defense and national security...."). As the D.C. Circuit recognized, basic elements of due process such as "notice, grounds, opportunity to respond and be heard" are subject to "essential national security considerations." *Gonzalez v. Freeman,* 334 F.2d 570, 580 n. 21 (D.C.Cir.1964); *cf. Snepp v. United States,* 444 U.S. 507, 509 n.3, 100 S.Ct. 763, 62 L.Ed.2d 704 (1980) ("The Government has a compelling interest in protecting both the secrecy of information important to our national security and the appearance of confidentiality so essential to the effective operation of our foreign intelligence service."); *Martin v. Lauer,* 686 F.2d 24, 34 (D.C.Cir.1982) (recognizing that the government's interest in nondisclosure in the Freedom of Information Act context is "perhaps greatest when government information concerns national secrets.").

■ Here, the interests of national security preclude the Government from divulging classified military intelligence to entities regarded as potential threats to United States military forces. *See Makky v. Chertoff,* 541 F.3d 205, 217–18 (3d Cir.2008) (employee of Transportation Security Administration was not entitled to notice of classified allegations leading to his suspension, because agency was prohibited by law from releasing the information); *see also* 18 U.S.C. § 798 (2006) (criminalizing unlawful release of classified information); *Exec. Order No. 13526,* 75 Fed. Reg. 707, 726 (Dec. 29, 2009) ("Officers and employees of the United States Government ... shall be subject to appropriate sanctions if they knowingly, willfully, or negligently:

(1) disclose to unauthorized persons [classified] information....").

The statutory mandate in 28 U.S.C. § 1491(b)(3) that this Court give due regard to the interests of national defense and national security coupled with precedent indicating that national security concerns trump due process rights dictate a ruling that CJ2X was not required to provide any additional procedural safeguards to MG AA as part of the vendor vetting process. *See Cafeteria & Rest. Workers Union, Local 473 v. McElroy,* 367 U.S. 886, 896, 81 S.Ct. 1743, 6 L.Ed.2d 1230 (1961) (holding that no hearing was required where Navy revoked employee's security clearance because the governmental function at issue was "to manage the internal operation of an important federal military establishment") (citations omitted).

In sum, although MG AA's vendor vetting rating precluded MG AA from being eligible for DoD contracts in Afghanistan for up to one year, given national security interests, MG AA was not entitled to receive formal notice of, or an opportunity to respond to, its vendor vetting rating. As such, the contracting officer reasonably relied on CJ2X's assessment in MG AA's responsibility evaluation.

### The Army Was Not Required to Notify MG AA of Its Rejection Under the Vendor Vetting Procedures

■ MG AA alleges that the Army failed to follow the vendor vetting procedures when it did not notify MG AA during its August 10, 2011 debriefing that it had been "rejected" and failed to advise MG AA of its right to reconsideration. MG AA's argument hinges on its contention that it should have been deemed an "apparent successful offeror" within the meaning of the Acquisition Instruction at the time of its August 10, 2011 debriefing. The Acquisition Instruction requires:

If, and only if, the rejected *apparent successful offeror* requests a debriefing, inform them of the following, in writing, after coordinating with CJA:

"You were determined to be ineligible for award of subject contract by United States Forces—Afghanistan/Iraq. You may submit a written request for reconsideration

of this determination to USFOR–A/USF–I, through the Contracting Officer, within 60 calendar days of this notification."

REF 76 (emphasis added). Otherwise, upon confirmation that a vendor is rejected, the contracting officer "shall bypass the rejected offeror and consider the next best offeror in the competitive range for award." REF 76. The Acquisition Instruction states that "[i]f an offeror is not the apparent successful offeror, follow normal procedures. **DO NOT MENTION THEIR INELIGIBILITY [.]**" *Id.*

On August 10, 2011, the date on which Plaintiff claims it should have been informed of its CJ2X "rejected" status at its debriefing, MG AA was not an "apparent successful offeror." The label of apparent successful offeror typically applies to an offeror that has satisfied all requirements for award at a given point in time. Here, the contracting officer had already notified MG AA prior to August 10, 2011, of "adverse information" concerning MG EMA's past performance, including forgery, failure to comply with ITV requirements, and withheld payments. AR 16237–38. By letter dated July 30, 2011 (revised on July 31, 2011), the contracting officer notified MG AA that it was being evaluated for responsibility and listed areas of concern relating to MG EMA's performance, characterizing these concerns as "adverse information which may impact the responsibility determination." AR 16237–38, 16244–45. Importantly, when it requested a debriefing on August 10, 2011, Plaintiff was already aware that it had been deemed nonresponsible and rejected from the NAT procurement. MG AA received notification of the Army's nonresponsibility determination earlier the same day on August 10, 2011. AR 16328, 16338–39. Because MG AA was not an "apparent successful offeror" on August 10, 2011, when it received its written debriefing, the contracting officer was under no obligation to notify MG AA in its written debriefing that it had an opportunity to request reconsideration of its [redacted] vendor vetting rating.

### The Contracting Officer Reasonably Considered Unsatisfactory ITV Utilization

 MG EMA also had an unsatisfactory record of ITV use—the requirement that car-

riers install satellite-based tracking devices on cargo trucks—that raised serious doubts as to MG AA's reliability to perform in a warzone. The HNT statement of work required that "[a]ll vehicles used in support of HNT missions must have [an ITV] device . . . ." AR 21225. Despite this requirement, MG EMA's average rate of ITV use for one four-week period was only seven percent, according to a December 22, 2009 letter of concern. AR 16268. In its response to this letter of concern, MG EMA did not dispute its low ITV utilization rate and outlined a corrective action plan. *See* AR 21255–57. However, MG EMA's corrective actions failed to remedy its low ITV use rates, as evidenced by a cure notice issued on July 5, 2011. AR 16280–81. The cure notice stated that between April 1, 2010 and April 1, 2011, MG EMA's average ITV utilization rate was 56%. AR 16280. MG EMA conceded that "[h]istorically, as evidenced by our April 2010–April 2011 statistics, we've not been one of the top ITV performers." AR 16282.

MG AA contends that MG EMA's ITV use improved significantly and that from the end of April 2011 to July 9, 2011, MG EMA's average ITV use rate was 88%. AR 16282. However, MG EMA's improved performance for three months does not alter its failure to comply with ITV requirements for the majority of its HNT contract performance.

### The Contracting Officer Reasonably Relied on Withheld Payments

 The contracting officer also concluded that MG AA was nonresponsible because the Army withheld millions of dollars from MG EMA under the HNT contract "for a combination of failed missions, Cancelled No Pay Missions, Pilferage/Backcharges and Fuel Backcharges . . . ." MGA 5. The contracting officer found that these withholdings totaled $23,200,686.62, attributing $6,051,042.62 "to MG Altus' performance failures." *Id.* The contracting officer also cited a December 22, 2009 letter of concern, which stated: "[t]here have been several recent allegations regarding the loss, theft, and pilferage of supplies being transported by HNT contractors and their subcontractors." MGA 2; AR 16268.

MG AA contends that the majority of the funds were withheld not because of any fault on MG EMA's part but because the Government cancelled missions. MG AA also asserts that it is only aware of approximately $2.5 million being withheld by the Government and concedes that "[a]t most, the figure is approximately $3 million." [16] Pl.'s Mot. for J. on the Admin. R. 24. Whether the withheld amounts attributable to MG EMA's nonperformance should have been closer to $2.5 million or to $6 million, these withheld payments were substantial and provided a reasonable ground for the contracting officer's nonresponsibility finding.

Nevertheless, MG AA contends that this performance concern should not have been a basis for MG AA's nonresponsibility determination. Specifically, MG AA argues that MG EMA took corrective action to reduce theft and pilferage during HNT performance and demonstrated that "the alleged pilferage was beyond its control" when it informed the HNT contracting officer that pilferage could be attributed to measuring and dispensing errors by the Army and pointed out that fuel was stolen after delivery by MG EMA. Pl.'s Reply–Response 16. Although outside individuals may have contributed to pilferage attributed to MG EMA, MG AA acknowledges that MG EMA was responsible for some pilferage, and MG AA's arguments do not exonerate MG EMA of its failure to adopt proper controls over cargo to prevent pilferage.

### The Contracting Officer Reasonably Considered Forged TMRs and MG EMA's Referral for Proposed Debarment

 The contracting officer also concluded that MG AA was nonresponsible based upon forged TMRs. The contracting officer cited an August 31, 2010 letter of concern for submission of forged TMRs and further stated in the responsibility determination that "reported reoccurring instances of submission of forged TMRs under [the HNT contract] demonstrates MG Altus' integrity issues and lack of business ethics." MGA 5. In response to the contracting officer's notifica-

tion of the ongoing responsibility evaluation, MG AA acknowledged that MG EMA's drivers forged TMRs. *See* AR 16255 (describing forgeries by drivers), 16258 (estimating "approximately 20 mission sheets forged during the 2+ year span of this contract"). MG AA attempted to downplay the forgeries, asserting that "[a]s a percentage of the 24,000+ missions performed by MG EMA JV, we estimate that a forged mission sheet is submitted less than 0.1% of the time." AR 16259. However, it was within the contracting officer's discretion to determine to what extent admitted instances of fraud indicated a lack of integrity and business ethics. *John C. Grimberg Co.*, 185 F.3d at 1303 ("Because responsibility decisions are largely a matter of judgment, contracting officers are generally given wide discretion to make this decision.").

 In finding MG AA nonresponsible, the contracting officer also cited MG EMA's referral for proposed debarment. MGA 6, 46–49. The contracting officer noted that "[o]n 13 Jul 2011 a referral for proposed debarment of MG Altus was submitted by Task Force 21010 USFOR–A based on numerous alleged acts of criminal misconduct such as forgery and false claims ....." MGA 6. The referral for proposed debarment indicated that "MG/EMA allegedly submitted 5 forged Transportation Movement Requests (TMRs) to members of the 313[th] Joint Movement Control Battalion ... [the Criminal Investigation Division] estimates that MG/EMA submitted 5 forged TMRs for payment for a total value of $72,000." MGA 46–47. An April 8, 2011 Criminal Investigation Division ("CID") report attached to the referral indicated that sworn statements from Army personnel and forged TMRs "attest[ed] to the fact that numerous TMR fuel deliveries were never received and the TMR documents had been fictitiously executed as complete without their knowledge." MGA 52.

MG AA contends that the contracting officer's reliance on the referral was improper because (1) the referral was for MG EMA, not MG AA; (2) MG EMA was never notified

---

16. MG AA acknowledges that it is aware of fuel losses of less than $1 million, a $1.6 million claim for pilfered dental supplies, and a small number of dry cargo pilferage cases. AR 16257–58.

that it had been referred for proposed debarment; and (3) MG EMA satisfactorily addressed the alleged forgeries during performance of the HNT contract.[17] Pl.'s Mot. for J. on the Admin. R. 25. Defendant argues that MG AA has not disputed that the alleged forgeries underlying the referral occurred and further claims that MG AA has acknowledged that the forgeries were a result of MG EMA's failure to train drivers and penalize those responsible for fraud.

Although MG AA claims that MG EMA was never notified that it had been referred for proposed debarment, MG EMA was notified of the concerns underlying the referral during HNT performance and afforded an opportunity to respond. MG AA acknowledges that the HNT contracting officer addressed allegedly forged TMRs in correspondence with MG EMA during its HNT performance, and MG EMA identified proposed corrective actions to prevent forgeries. See AR 16268–69, 16277–78, 21262–65. Although MG EMA implemented corrective actions, including fining and blacklisting drivers that submitted forged mission sheets, these measures did not effectively prevent forgeries from recurring. The contracting officer reasonably concluded that MG EMA did not institute adequate controls to ensure that forgeries did not recur.

### The Contracting Officer Reasonably Considered an MG EMA Employee's Unauthorized Access to a Military Base

■ In determining MG AA nonresponsible, the contracting officer also relied upon a finding that, according to an intelligence report, on August 5, 2011, an Afghan national attempted to gain unauthorized access to a military base with fraudulent identification he claimed was provided by MG EMA. MGA 6–7. In addition, the Afghan national indicated that MG EMA regularly provided false identification to MG EMA's employees. MGA 6. In response to an August 9, 2011 letter of concern and another letter from the HNT contracting officer dated August 12, 2011, MG EMA stated that this was an isolated occurrence in which an MG EMA driver used another MG EMA employee's identification card to gain access to a military base. AR 21270–75. MG EMA claimed that there had been no other documented occurrences of identification swapping. AR 21271, 21274. By letter dated August 16, 2011, the contracting officer allowed MG EMA to resume HNT contract missions. AR 21276.

MG AA argues that a single documented instance of attempted base access is insufficient to justify a finding that MG AA lacked integrity and business ethics. However, this type of assessment is a quintessential business judgment, and this Court will not second guess the contracting officer's judgment where there is supporting evidence. See Bender Shipbuilding & Repair Co., 297 F.3d at 1362 (Fed.Cir.2002); News Printing Co., 46 Fed.Cl. at 746. The contracting officer reasonably concluded that this instance of providing fraudulent identification to circumvent military security indicated a lack of integrity and business ethics.

### The Contracting Officer Reasonably Considered MG EMA's Refusal of Missions

■ The contracting officer cited MG EMA's refusal of missions as a basis for MG AA's determination of nonresponsibility. MGA 7. In a July 5, 2011 cure notice referenced in the nonresponsibility determination, the HNT contracting officer stated that HNT contractors "are responsible for ensuring personnel, trucks and equipment are able to travel on any route, to and from any location within Afghanistan as directed on [TMRs]," and that "[r]efusing missions to 'no-go' areas is not authorized in the contract terms." AR 16280.

MG AA does not deny that it refused some missions when there was a high risk of loss of life, but contends that it was permitted to do so by FAR 52.212–4's exception for "acts of the public enemy." Pl.'s Mot. for J. on the Admin. R. 24. FAR 52.212–4(f) provides that a contractor is not liable for default if its nonperformance is caused by "[e]xcusable delays" that are "beyond the reasonable control of the [c]ontractor and without its fault or

---

17. Defendant advised this Court in a status report filed on November 22, 2011 that it would notify the Court if any administrative proceedings were instituted that would affect the Court's jurisdiction. Def.'s Status Report 1, Nov. 22, 2011.

negligence," including specified events, such as fires, floods, strikes, and "acts of . . . the public enemy." FAR 52.212–4(f) (2010). MG AA also contends that it worked with the Army to eliminate some, but not all, of the locations it identified as "no go" locations and that the Army did not dispute MG EMA's approach.

Although the Army did not terminate MG EMA for default based upon its refusal of missions, the NAT contracting officer was entitled to consider this past performance concern in MG AA's responsibility determination. *See MCI Constructors. Inc.*, 1990 WL 293560, at \*3 ("A nonresponsibility determination may be based upon the contracting agency's reasonable perception of inadequate prior performance, even where the agency did not terminate the prior contract for default. . . ."). The Court will not second guess the contracting officer's conclusion in MG AA's nonresponsibility determination that MG EMA's refusal of missions constituted inadequate past performance. *See Bender Shipbuilding & Repair Co.*, 297 F.3d at 1362 ("We cannot substitute our judgment for that of the contracting officer in making responsibility determinations.").

### The Contracting Officer Reasonably Considered MG EMA's Corrective Action

 MG AA argues that although MG EMA satisfactorily addressed every issue raised by the Army during HNT contract performance, the NAT contracting officer did not credit MG EMA's corrective actions in her responsibility determination. Contrary to Plaintiff's argument, the contracting officer reasonably concluded that MG EMA's documented record of nonperformance outweighed its corrective action after considering the cure notices and letters of concern detailed in the nonresponsibility determination and MG EMA's responses and corrective action. Although MG EMA attempted to

improve its performance and did implement some corrective action, the record clearly establishes that MG EMA had significant lapses in its required performance under the HNT contract. Where a contractor's performance has been unsatisfactory, its implementation of some degree of corrective action does not preclude an agency from finding that contractor nonresponsible. *Cf. Stapp Towing Inc. v. United States*, 34 Fed.Cl. 300, 309–10 (1995) (upholding Small Business Administration's refusal to issue a certificate of competency to contractor with an unsatisfactory safety record, despite contractor's ongoing corrective action); *Reel–O–Matic Sys., Inc.*, 16 Cl.Ct. at 98–101 (upholding Small Business Administration's refusal to issue a certificate of competency to contractor based in part on contractor's "unsatisfactory performance record in the past on the same type of contract," despite contractor's attempts to increase capacity and hire new technical qualified personnel).

MG AA further alleges that the contracting officer did not credit its "corrective action" of replacing EMA with Altus and Apache for the NAT procurement to address concerns arising from EMA's HNT performance. Pl.'s Reply–Response 10. MG AA claims that although FAR 9.104–3(b) requires consideration of corrective action, the contracting officer failed to consider its corrective measure to mitigate future performance risk. MG AA's argument effectively acknowledges that EMA's HNT performance was flawed and that MG, as a member of the MG EMA joint venture, was unable to ensure adequate performance by its joint venture partner. Although MG AA maintains that it resolved its HNT performance concerns by distancing itself from EMA and teaming with Altus and Apache for the NAT procurement, MG has not demonstrated that the contracting officer erred in her past performance assessment.[18]

---

18. Plaintiff also alleges that the contracting officer's decision to deem MG AA nonresponsible based on MG EMA's noncompliance with PSC arming requirements and the statutory Defense Base Act ("DBA") insurance requirement was irrational. The record does not establish whether MG EMA had submitted PSC arming and DBA insurance documentation to the HNT contracting officer by the required deadline. Even if MG EMA was compliant with such HNT requirements however, MG AA has not shown that the contracting officer's reliance on these performance concerns tainted the remainder of its nonresponsibility determination or that, absent these concerns, it should have been found responsible.

### MG AA Has Not Shown That the Army Adopted a Politically Motivated Blacklist Precluding MG AA from Receiving a NAT Award

█ MG AA claims that it was arbitrarily excluded from the NAT competition because the Army adopted an improper "blacklist" excluding all HNT incumbent contractors. Plaintiff contends that the Army's blanket exclusion of all HNT contractors, but not HNT subcontractors, based on their nonresponsibility evaluations was contrary to the FAR and the solicitation. MG AA further contends that the Army's nonresponsibility determinations for the HNT incumbent contractors were pretexts for the Army's politically motivated blacklisting of these contractors.

Although Plaintiff denies that it is alleging bad faith, the substance of MG AA's argument is that the Army's responsibility determinations were pretextual and manufactured to exclude the HNT contractors from the NAT procurement. Such an allegation is a quintessential allegation of bad faith because it claims that the entirety of all HNT contractors' nonresponsibility determinations were unfounded fabrications. *See Madison Servs., Inc. v. United States,* 92 Fed.Cl. 120, 130 (2010) (rejecting plaintiff's argument that "bad faith is 'not essential to establish that a cancellation was a pretext' " as an "untenable" argument). Accordingly, the Court construes Plaintiff's pretext argument as an allegation that MG AA's responsibility evaluation was conducted in bad faith.

█ A bidder alleging bad faith bears a heavy burden of proof to establish its claim with clear and convincing evidence. *See Am–Pro Protective Agency, Inc. v. United States,* 281 F.3d 1234, 1241 (Fed.Cir.2002) (requiring contractor to make a showing of clear and convincing evidence to support claim that agency did not act in good faith). As the Federal Circuit has recognized,

> [W]hen a bidder alleges bad faith, "[i]n order to overcome the presumption of good faith [on behalf of the government], the proof must be almost irrefragable." *Info. Tech. Applications Corp. v. United States,* 316 F.3d 1312, 1323 n. 2 (Fed.Cir.2003). "Almost irrefragable proof" amounts to

"clear and convincing evidence." *Am–Pro Protective Agency, Inc. v. United States,* 281 F.3d 1234, 1239–40 (Fed.Cir.2002). "In the cases where the court has considered allegations of bad faith, the necessary 'irrefragable proof' has been equated with evidence of some specific intent to injure the plaintiff." *Torncello v. United States,* 231 Ct.Cl. 20, 681 F.2d 756, 770 (1982).

*Galen Med. Assocs., Inc. v. United States,* 369 F.3d 1324, 1330 (Fed.Cir.2004).

MG AA alleges that the Army was apparently under pressure from "politicians, the press or Department of Defense officials" to exclude HNT contractors from the NAT procurement. Pl.'s Mot. for J. on the Admin. R. 11. Plaintiff notes that "the [contracting officer] felt pressure from some Congress members to exclude all HNT incumbents...." Pl.'s Reply–Response 5. Plaintiff's imprecise allegations that these groups caused the Army to implement a blacklist excluding all HNT contractors from the NAT procurement is conjecture, wholly devoid of record support, and does not come close to making a showing of clear and convincing evidence required to prove bad faith.

The performance concerns identified by the contracting officer in MG AA's responsibility determination were not, as Plaintiff contends, "relatively minor matters of contract administration" Pl.'s Mot. for J. on the Admin. R. 11. MG EMA's [redacted] noncompliance with ITV standards, forged mission sheets, pilferage, and withheld payments due to nonperformance taken together reflect sufficient shortcomings to support a nonresponsibility determination. The contracting officer's reliance on MG EMA's documented HNT performance failures was a reasonable business judgment, and the fact that the press, Congress, and DoD officials were critical of all HNT contractors' practices does not demonstrate the contracting officer's bad faith toward MG AA.

MG AA also contends that the Army's disparate treatment of the HNT prime contractors as compared to the HNT subcontractors is evidence that the Army blacklisted these HNT contractors or applied a per se debarment standard to them. Specifically,

Plaintiff contends that the Army systematically rejected all of the HNT prime contractors after subjecting them to a more rigorous responsibility evaluation than that applied to the HNT subcontractors. However, the Army's exclusion of other HNT offerors from the NAT procurement based upon their individualized nonresponsibility determinations is not probative evidence that MG AA's responsibility evaluation was unreasonable. Plaintiff's effort to impugn a contracting officer's individual responsibility determinations of the other HNT prime contractors not only requires Plaintiff to marshal substantial additional proof but also would, if seriously pursued, significantly have expanded the record and scope of MG AA's bid protest. Although the responsibility determinations for the NAT awardees are in the AR, the nonresponsibility determinations for seven former HNT prime contractors are not, and Plaintiff did not seek to add them. *See* AR 17904–18232. As such, there is no factual predicate to conduct the disparate treatment analysis Plaintiff urges the Court to undertake. Plaintiff has failed to demonstrate that the contracting officer implemented a "blacklist" or unfairly excluded all HNT contractors from the NAT competition.

### MG EMA's Overall Performance on the HNT Contract

 The contracting officer reasonably determined that MG EMA's performance on the HNT contract as a whole raised serious doubts about MG AA's ability to perform the NAT contract, citing MG EMA's [redacted] failure to comply with ITV standards, forged mission sheets, pilferage, and withheld payments for performance failures. These findings were sufficient to justify the contracting officer's conclusion that MG AA was nonresponsible. MG AA's arguments that it subsequently improved its nonperformance do not alter the evidence that such misconduct occurred.

 The FAR does not require that each of the contracting officer's conclusions be independently sufficient on its own to support a finding of nonresponsibility. Rather, the contracting officer's nonresponsibility determination as a whole must be rational. *See Ettefaq–Meliat–Hai–Afghan Consulting,*

*Inc.,* 106 Fed.Cl. at 438–39; *To the Sec'y of the Army,* 43 Comp. Gen. 257, 263–64 (1963). Here, the contracting officer found noncompliance with PSC arming requirements and DBA insurance requirements where the record does not clearly indicate such noncompliance and referenced MG EMA's practice of providing fraudulent identification where the record indicates only one documented incident. Even acknowledging those instances where the contracting officer was imprecise in her assessment of MG EMA's performance, MG EMA's cumulative failures provided a reasonable basis for the contracting officer's business judgment that MG AA lacked the requisite business integrity, ethics, and perseverance to perform the NAT contract. *E.g., To the Sec'y of the Army,* 43 Comp. Gen. at 263–64 (finding nonresponsibility determination reasonable because the cumulative effect of deficiencies including minor deficiencies—would "unduly ... increase the burden of administration from the Government's standpoint.").

### Conclusion

Plaintiff's Motion to Supplement the Court Record is **DENIED.**

Defendant's Motion for Judgment on the Administrative Record is **GRANTED.** Plaintiff's Motion for Judgment on the Administrative Record and Permanent Injunction is **DENIED.** The Clerk of Court is directed to enter judgment accordingly.

The parties and the classified information security officer shall propose redactions to this opinion by **May 27, 2013.**